148 F.3d 638
 158 L.R.R.M. (BNA) 2705, 135 Lab.Cas. P 10,193
 MID-AMERICA CARE FOUNDATION, d/b/a Fair Oaks Health Care
Center, Petitioner/Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner.
 Nos. 97-5433, 97-5535.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 1, 1998.
Decided July 8, 1998.
 
 Douglas M. Nabhan (argued and briefed), Williams, Mullen, Christian & Dobbins, Richmond, Virginia, for Petitioner/Cross-Respondent.
 David Habenstreit (briefed), National Labor Relations Board, Office of the General Counsel, Washington, DC, Aileen A. Armstrong (briefed), Deputy Associate General Counsel, National Labor Relations Board, Appeal Court Branch, Washington, DC, Fred B. Jacob (argued and briefed), National Labor Relations Board, Appellate Court Branch, Washington, DC, for Respondent/Cross-Petitioner.
 Before: NELSON, BOGGS, and CLAY, Circuit Judges.
 OPINION
 BOGGS, Circuit Judge.
 
 
 1
 Once again we confront the question of whether licensed practical nurses ("LPNs") employed in a nursing home are "supervisors" as that term is defined by the National Labor Relations Act ("NLRA"). As in many prior cases, we must vacate the order of the National Labor Relations Board ("NLRB"), which found the LPNs at issue not to be statutory supervisors.
 
 
 2
 * For those who have followed our cases involving the supervisory status of nurses over the last 11 years, the facts of this case will seem familiar. Petitioner/Cross-Respondent Mid-America Care Foundation ("Mid-America") operates a 48-bed long-term nursing facility in South Beloit, Illinois, called Fair Oaks Health Care Center ("Fair Oaks").[1] The management structure at Fair Oaks consists of an Administrator, a Director of Nursing ("DON"), and an Assistant Director of Nursing ("ADON"). There are two organizational layers below the DON/ADON level at Fair Oaks: nurses, including both registered nurses and LPNs; and certified nursing assistants ("assistants"). From Mid-America's perspective, there appears to be no distinction between the duties of registered nurses and LPNs; most internal documents refer to registered nurses and LPNs interchangeably as "nurses."
 
 
 3
 Fair Oaks operates on a three-shift schedule. During the day shift, which is defined as 6:30 a.m. to 2:30 p.m., either the DON or the ADON (or both) is on duty, along with two nurses and four or five assistants. Neither the DON nor the ADON is on duty during the 2:30 p.m.-to-10:30 p.m. afternoon shift or the 10:30 p.m.-to-6:30 a.m. night shift. The afternoon-shift duty roster includes one nurse and four or five aides. The night shift is staffed with one nurse and two or three aides. In short, as the NLRB's Regional Director found in an earlier proceeding in this matter, "[d]uring the afternoon and night shifts and on weekends, the nurse on duty is the highest authority present in the facility."
 
 
 4
 Nurses at Fair Oaks exercise authority over assistants in several areas. For example, nurses fill out evaluation forms on assistants.[2][2] These forms require nurses to evaluate assistants on a four-point scale on 41 different performance measures; in addition, at the bottom of the form nurses must fill out the following statement:
 
 
 5
 Recommendations to the Administrator. The services of this employee have _____ have not _____ been consistently up to [Fair Oaks] standards. I recommend dismissal _____ continuation _____ other action _____. (Explain other action. Use reverse side of form[.] )
 
 
 6
 Nurses also have the authority to take disciplinary action against aides. While Mid-America policy provides that disciplinary recommendations from nurses are subject to management review, the Administrator of Fair Oaks testified that she has never overturned a nurse's disciplinary recommendation. Under Mid-America's policy, an assistant is to be automatically terminated upon receiving three disciplinary notices.
 
 
 7
 Nurses at Fair Oaks also are responsible for supervising employees and handling problems outside the nursing department during the afternoon and night shifts. Moreover, nurses are required to deal with temporary staffing shortages in the nursing department. In fact, according to the Administrator of Fair Oaks, nurses have the power to require assistants to work overtime in the event that a scheduled assistant fails to report for a shift, though the record indicates that the usual practice is for nurses to request (rather than require) assistants to work overtime.
 
 II
 
 8
 On May 1, 1996, Local 325 of the International Brotherhood of Teamsters ("Union") filed a petition with the NLRB seeking to represent a bargaining unit of Fair Oaks employees that included registered nurses and LPNs. Mid-America objected to the inclusion of nurses in the bargaining unit on the ground that the nurses were supervisors within the meaning of the NLRA. The Regional Director of NLRB Region 19 (in Seattle, Washington[3]) rejected Mid-America's arguments and directed that a representation election be held. Because the Regional Director found that Mid-America's registered nurses were "professional" employees, however, he directed that the registered nurses vote in a voting group separate from the voting group that included the LPNs.
 
 
 9
 Mid-America immediately requested that the NLRB review the Regional Director's decision, but the NLRB upheld the Regional Director's findings and order. On July 24, 1996, a union representation election was held. While the registered nurses voted against representation by the Union, the voting group that included the LPNs voted 21 to 18 to designate the Union as its exclusive representative for collective-bargaining purposes. Shortly thereafter, the Union requested that Mid-America bargain and Mid-America refused, arguing that the LPNs were supervisors and therefore could not be included in the bargaining unit. The General Counsel of the NLRB then filed a complaint against Mid-America under Section 8(a)(1) and 8(a)(5) of the NLRA, 29 U.S.C. §§ 158(a)(1) & (a)(5). On April 2, 1997, the NLRB granted the General Counsel's motion for summary judgment.
 
 
 10
 This matter is now before us on Mid-America's petition for review of the NLRB's order, and on the NLRB's cross-petition for enforcement.
 
 III
 
 11
 * In six prior reported decisions, we have vacated NLRB decisions that found nurses not to be supervisors within the meaning of the NLRA. See Grancare, Inc. v. NLRB, 137 F.3d 372 (6th Cir.1998); Caremore, Inc. v. NLRB, 129 F.3d 365 (6th Cir.1997); Manor West, Inc. v. NLRB, 60 F.3d 1195 (6th Cir.1995); Health Care & Retirement Corp. v. NLRB, 987 F.2d 1256 (6th Cir.1993), aff'd, 511 U.S. 571, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994); Beverly California Corp. v. NLRB, 970 F.2d 1548 (6th Cir.1992); NLRB v. Beacon Light Christian Nursing Home, 825 F.2d 1076 (6th Cir.1987). This case is controlled by these precedents, and we find the facts here to be particularly analogous to the facts of Caremore.
 
 
 12
 In Caremore, we noted that Section 2(11) of the NLRA defines a "supervisor" as any employee who (1) exercises authority in one of 11 statutorily listed areas, (2) exercises the authority in the interests of the employer, and (3) uses independent judgment in the exercise of the authority. See Caremore, 129 F.3d at 369. We held that Caremore's LPNs satisfied the statutory definition of "supervisor" in several ways. First, because the LPNs provided direction to nurses' aides involving "aspects of patient care," assigned aides to various wings of the nursing home, and on occasion asked aides to work overtime, they had the statutory authority to "assign" and "responsibly to direct" nurses' aides. See ibid. Second, because the LPNs' duties included filling out evaluation forms with a recommendation that the evaluated aide be either retained or terminated, and filing disciplinary reports with respect to aides, and because the Director of Nursing accorded deference to LPNs' recommendations, we concluded that the LPNs had the statutory authority "effectively to recommend" discipline and discharge of nurses' aides. See ibid. As in this case, the NLRB argued that Caremore's LPNs exercised whatever authority they had only in a routine fashion, without using independent judgment; we rejected the NLRB's argument, noting that the "kinds of sensitive and nuanced judgments" entailed by evaluating nurses' aides on a complex evaluative scale, coupled with the power to run the nursing home without any other on-site supervision during the afternoon and night shifts, mandated a conclusion that the LPNs used independent judgment. See id. at 370.
 
 
 13
 The similarities between this case and Caremore are extensive. Here, Mid-America's LPNs have the authority not only to direct the activities of certified nursing assistants under a prescribed care plan, but also to direct the activities of personnel in other departments during the afternoon and evening shifts. Here, the LPNs' duties not only involve asking assistants to work overtime in the event of a staffing shortage, but include the power to "mandate" overtime, according to the Fair Oaks Administrator. Mid-America's LPNs fill out complex evaluation forms just like Caremore's LPNs, and they similarly recommend either retention or dismissal of the evaluated assistants; moreover, in each case, LPN recommendations are given great weight by nursing-home management. As in Caremore, Mid-America's LPNs are the highest-ranking employees on duty on the afternoon and evening shifts, and on those shifts a single LPN is responsible for supervising several assistants. While no one of these facts would necessarily require that the NLRB's order be vacated, taken together they compel the conclusion that the NLRB's order is not supported by substantial evidence. Cf. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").
 
 B
 
 14
 Because of the close factual similarities between this case and prior cases such as Caremore, we ordinarily would simply dispose of this matter in a brief, unpublished opinion applying the well-established law of the circuit. We believe it is important, however, to address in greater detail the NLRB's argument that we should simply defer to the NLRB's order under the principle of Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), an argument previously identified in a concurring opinion by one of our colleagues. See Grancare, Inc. v. NLRB, 137 F.3d 372, 377 (6th Cir.1998) (Moore, J., concurring). The NLRB argues that its interpretation of the statutory phrase "independent judgment" is entitled to deference and is dispositive in this case.
 
 
 15
 Chevron is perhaps the seminal modern case in the field of administrative law. See, e.g., 1 KENNETH CULP DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 3.2, at 110 (3d ed.1994). The Supreme Court held in Chevron that, when the administrative agency primarily charged with enforcement of a statute promulgates a regulation interpreting that statute in a particular way, judicial review of the administrative regulation entails a two-step inquiry. First, if "Congress has directly spoken to the precise question at issue," the reviewing court must give effect to the will of Congress irrespective of any contrary agency interpretation. See Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778. If the intent of Congress on a matter of statutory meaning is ambiguous, however, the court is to proceed to "step two" of the Chevron inquiry: whether the agency's interpretation is a "permissible construction of the statute." Id. at 843, 104 S.Ct. 2778.
 
 
 16
 Chevron all too often is taken to mean simply that administrative agencies win in any dispute involving a question of statutory construction. Plainly, this is incorrect; both the Supreme Court and our court have made clear that there are numerous instances in which an agency's interpretation of an ambiguous statute is not entitled to the broad deference envisioned by Chevron. An agency's interpretation is not entitled to Chevron deference, for example, if the apparent statutory ambiguity can be resolved using "traditional tools of statutory construction." See INS v. Cardoza-Fonseca, 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Similarly, courts do not accord Chevron deference to non-binding advisory opinions of an administrative agency. See, e.g., Crandon v. United States, 494 U.S. 152, 177, 110 S.Ct. 997, 108 L.Ed.2d 132 (Scalia, J., concurring); Mgmt. Recruiters Int'l, Inc. v. Bloor, 129 F.3d 851, 856 (6th Cir.1997). Nor does Chevron deference extend to an interpretation taken solely in connection with an agency's litigating position in a particular case or set of cases. See, e.g., Massachusetts v. FDIC, 102 F.3d 615, 622 (1st Cir.1996); Georgetown Univ. Hosp. v. Sullivan, 934 F.2d 1280, 1283 n. 3 (D.C.Cir.1991).
 
 
 17
 In short, Chevron deference is limited in application to those situations in which an agency has formally adopted a particular interpretation of a statute. See Chevron, 467 U.S. at 843, 104 S.Ct. 2778 (judicial deference is designed to recognize agencies' wide latitude in the "formulation of policy and the making of rules to fill any gap left ... by Congress"). Admittedly, when an agency adopts a particular interpretation of a statute through an adjudication (such as the NLRB's adjudication of the Union's dispute with Mid-America), that interpretation normally would be entitled to Chevron deference. See, e.g., Massachusetts v. FDIC, 102 F.3d at 621. However, as the Supreme Court explained just this year, when an agency's application of a statutory interpretation (which itself ordinarily would be entitled to deference) frustrates judicial review by "subtly and obliquely" revising the stated interpretation to impose a more stringent definition or a higher standard of compliance in certain factual contexts, Chevron deference is inappropriate. See Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, ---- - ----, 118 S.Ct. 818, 827-28, 139 L.Ed.2d 797 (1998).
 
 
 18
 In Allentown Mack, the employees at a Mack Truck dealership were represented by a union. Allegedly acting under a good faith belief that a majority of the employees no longer supported the union, the employer conducted a poll of the employees that revealed that 19 of 32 employees no longer wanted the union to represent them. See id. 118 S.Ct. at 821. The union then filed an unfair-labor-practice charge with the NLRB. In a decision adopted by the NLRB, an administrative law judge stated that the employer was required to demonstrate an "objectively reasonable doubt" as to the employees' support for the union, and purported to find that the employer did not demonstrate the requisite doubt despite the results of the poll. See ibid. The employer petitioned for review, and the NLRB cross-petitioned for enforcement, claiming that its finding of no "objectively reasonable doubt" was entitled to judicial deference. "[O]ver a vigorous dissent," the court of appeals enforced the NLRB's order. Ibid.
 
 
 19
 The Supreme Court reversed. The Court recognized the general Chevron-like principle that "[c]ourts must defer to the requirements imposed by the [NLRB] if they are 'rational and consistent with the Act.' " Id. 118 S.Ct. at 822 (quoting Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 42, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987)). The Court further noted that the NLRB's requirement of a showing of "objectively reasonable doubt" was a permissible interpretation of the NLRA provision at issue and therefore entitled to deference. See ibid. However, the Court found that the NLRB's decision that the employer could not conduct a poll of its employees to determine whether a majority still supported the union "covertly transform[ed] its presumption of continuing majority support into a working assumption that all of a successor's employees support the union until proved otherwise." Id. 118 S.Ct. at 825. The Court explained that, while the words invoked by the NLRB--"objectively reasonable doubt"--were themselves a permissible statutory interpretation, the NLRB's order purporting to apply these words was not entitled to judicial deference:
 
 
 20
 [A] series of cases that exemplify in practice its divorcing of the rule announced from the rule applied ... also frustrates judicial review. If revision of the Board's standard of proof can be achieved thus subtly and obliquely, it becomes a much more complicated enterprise for a court of appeals to determine whether substantial evidence supports the conclusion that the required standard has or has not been met. It also becomes difficult for this Court to know, when certiorari is sought, whether the case involves the generally applicable issue of the Board's adoption of an unusually high standard of proof, or rather just the issue of an allegedly mistaken evidentiary judgment in the particular case. An agency should not be able to impede judicial review, and indeed even political oversight, by disguising its policymaking as factfinding.
 
 
 21
 Id. 118 S.Ct. at 827-28.
 
 
 22
 As in Allentown Mack, here the NLRB has divorced the rule announced from the rule applied. The decision of the administrative law judge in this case correctly stated that "[i]ndependent judgment cannot be found where decisions are strictly regulated by specific employer policy." To the extent that this statement represents the official interpretation of the NLRB, it is entitled to deference under Chevron. But the mere incantation of this rule does not resolve this particular case in favor of the NLRB. As explained above, Mid-America's LPNs engage in several supervisory activities that are not "strictly regulated by specific employer policy." For example, they evaluate certified nursing assistants on numerous performance measures and recommend their retention or discharge. Moreover, they run the nursing home with no higher supervision for 16 hours each day. They even supervise non-nursing personnel. On these facts, we are bound to follow the Supreme Court and say that, while the NLRB may have stated the correct legal rule (or at least a rule that is entitled to deference), there is not substantial evidence to support its conclusion that Mid-America is liable under this rule.[4]
 
 C
 
 23
 Mid-America argues alternatively that, even if its LPNs are not supervisors within the meaning of the NLRA, they lack a sufficient community of interests to be included in a bargaining unit that also includes non-technical employees. Because we hold that Mid-America's LPNs are supervisors, we find it unnecessary consider this argument.
 
 IV
 
 24
 For the foregoing reasons, Mid-America's petition for review is GRANTED; the NLRB's cross-petition for enforcement is DENIED; and the NLRB's order is VACATED.
 
 
 
 [1]
 Our power to decide this matter, which originated in Illinois, outside the Sixth Circuit, is based on an idiosyncrasy of the NLRA. Under 29 U.S.C. § 160(f), "[a]ny person aggrieved by a final order of the [NLRB] ... may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business...."
 
 
 [2]
 At oral argument, counsel for the NLRB asserted that LPNs stopped filling out evaluation forms just before the administrative hearing in this matter. We find nothing in the record to support this claim; in any event, the record contains evaluation forms signed by LPNs between at least November 1992 and March 1996
 
 
 [3]
 The record does not explain why a matter from South Beloit, Illinois, would be handled by an NLRB official in Seattle. At oral argument, counsel for the NLRB explained that this matter was assigned to Region 19 for caseload management reasons
 
 
 [4]
 In a decision affirming one of our earlier cases, the Supreme Court specifically noted that, "in cases involving nurses," the NLRB has interpreted Section 2(11) of the NLRA "in a unique manner." NLRB v. Health Care & Retirement Corp., 511 U.S. 571, 574, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994). Perhaps tellingly, neither the Court nor the dissenting Justices mentioned Chevron