Ethan WALTON, et al., Plaintiffs–
Appellees,

v.

Marva Livingston HAMMONS, Director,
Michigan Family Independence Agen-
cy, Defendant–Appellant.

No. 98–1765.

United States Court of Appeals,
Sixth Circuit.

Argued June 17, 1999.

Decided Sept. 21, 1999.

Terri L. Stangl (briefed), Jacqueline Doig (argued and briefed), Center for Civil Justice, Saginaw, MI, for Plaintiff–Appellee.

Erica Weiss Marsden (argued and briefed), Office of the Attorney General, Social Services Division, Lansing, MI, for Defendant–Appellant.

Before: JONES, COLE, and CLAY, Circuit Judges.

OPINION

NATHANIEL R. JONES, Circuit Judge.

Defendant–Appellant Marva Livingston Hammons, in her capacity as director of the Michigan Family Independence Agency ("MFIA"), contests the district court's grant of summary judgment to Plaintiff–Appellee Ethan Walton. Specifically, the district court concluded that Hammons exceeded her authority under the Food Stamp Act ("FSA") by denying food stamps to the entire Walton family because Ethan Walton's mother was found to be non-cooperative in establishing the legal paternity of one of her children. Because the district court's holding comports with the text and legislative intent of the statutory provisions in question, we AFFIRM.

I.

A.

Since 1950, the federal government and the states have engaged in a cooperative effort to make monetary payments to financially needy families. In 1996, Con-

gress and President Clinton embarked on the latest phase of this effort by passing and signing into law the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"). PRWORA terminated Aid to Families with Dependent Children ("AFDC"), the federal program which had long provided cash assistance to poor families, and replaced it with Temporary Aid to Needy Families ("TANF"). Under TANF, each state receives a predetermined block of funding to distribute as the state sees fit. *See Kansas v. United States*, 24 F.Supp.2d 1192, 1194 (D.Kan.1998). PRWORA also amended certain sections of the FSA, which has been in place since 1964 to "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011 (1988).[1] While offering reforms which would allow states to "harmonize" food stamp with other assistance programs, Congress rejected the proposed utilization of a block grant scheme in administering the federal food stamp program. Instead, Congress opted to retain general federal government control to ensure that a " 'safety net' at the federal level" remained in place. H.R. Rep. 104–881 (104th Cong., 2d Sess. January 2, 1996). In the case *sub judice*, the parties dispute two provisions introduced by PRWORA that together permit states to impose sanctions with respect to TANF and food stamp benefits when a custodial parent fails to cooperate in establishing the paternity of her child or children.

Relying on the newly enacted TANF, the MFIA-the state agency responsible for administering the FSA program in Michigan-restructured the operation of Michigan's welfare system in 1997. As part of that restructuring, the MFIA implemented an administrative rule, Mich. Admin. Code r. 400.3125 (1997) (*reprinted* in 8

Mich. Reg. (Sept.1997) at 23–24), requiring the termination of a household's Family Independence Program ("FIP") cash assistance benefits when a member . of the household has failed (without "good cause") for at least four consecutive months to cooperate in establishing the paternity of a child. Claiming that it has statutory authority to do so, Michigan also applies that cash assistance disqualification "rule" to its administration of food stamps through the FSA, thereby terminating household food stamp assistance for the same acts of non-cooperation. Both FIP benefits and food stamps resume if the household member begins cooperating.

### B.

The plaintiffs in this class action lawsuit are children in danger of losing their food stamp support under the MFIA policy described above. The plaintiffs contend that the 1996 federal welfare reforms do not endow the State with the power to terminate food stamp benefits to an entire household for an individual member's non-cooperation in establishing paternity or obtaining child support.

Plaintiff Ethan Walton (the lead plaintiff) is three years old. His mother, Antoinette Walton, also has a daughter-Te'Asha Walton, age five-by another father. Ethan's father has acknowledged paternity and pays child support pursuant to a court order obtained with the cooperation of Antoinette. Unfortunately, the identity of Te'Asha's father is not as clear. Shortly after Te'Asha's birth in May 1992, Antoinette informed the state that Te'Asha's father was a "Mr. Jackson." However, in March 1993, she told the state that Te'Asha's father was Randle Mooring. In June 1996, a state court dismissed a paternity action against Mooring because a blood test had excluded him as a possible

---

1. The FSA operates by providing to eligible households coupons, or in some cases cash, to buy food at grocery stores or markets. While the federal government bears the full cost of all food stamp benefits, it shares the administrative expenses with the states; state agencies administer the program by certifying eligible households and issuing coupons or approved cash payments.

father of Te'Asha. Based on its determination that Antoinette did not cooperate in establishing Te'Asha's paternity, the MFIA terminated her then-AFDC grant in August 1996. The test of Mooring having proven negative, Antoinette again asserted in August and October 1996 that "Mr. Jackson" was Te'Asha's father. Although Antoinette notified the MFIA that she had little information about the purported father, she stated that she had seen him in a store and given him a picture of the child, and also knew that he lived on the same block as she did during her pregnancy. Neither the State nor Antoinette has successfully located him or further identified him.

Pursuant to the MFIA's administrative rule change, the MFIA in April 1997 notified Antoinette that her failure to cooperate regarding Te'Asha's paternity would compel the MFIA to terminate her family's FIP and food stamp benefits effective November 1, 1997–in other words, the MFIA would terminate both her own allotments and the allotments to Ethan and Te'Asha. Antoinette requested a hearing regarding the MFIA's decision. On November 10, 1997, a state administrative judge held that she had failed to cooperate with the MFIA in establishing the paternity of Te'Asha.

Ethan Walton filed this action on December 9, 1997, claiming that the defendant was denying him and other minor children food stamp benefits in violation of the FSA.[2] Specifically, the plaintiffs allege that PRWORA does not permit states to terminate FSA benefits due to parents' failure to cooperate in establishing paternity or child support payments, and that accordingly, FIA's termination of their food stamps would directly contravene the FSA. The district court granted Walton's motion for class certification on December 11, 1997, ordering a class under Fed. R.Civ.P. 23(b)(2) comprising "all past, present, and future Michigan Food Stamp

recipients whose Food Stamps have been or will be terminated because of the [MFIA non-cooperation policy]." J.A. at 190. The parties filed cross-motions for summary judgment on January 21, 1998. On March 20, 1998, the district court granted Walton's motion for summary judgment, and denied the defendant's motion as moot. On June 2, 1998, the court ordered defendant to revise its food stamp termination policy to comply with its March 20th opinion. This timely appeal followed.

## II.

We review *de novo* a district court's grant of summary judgment, using the same Rule 56(c) standard as the district court. *Terry Barr Sales Agency, Inc. v. All–Lock Co., Inc.*, 96 F.3d 174, 178 (6th Cir.1996). Under that standard, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In deciding a motion for summary judgment, we assess the factual evidence and draw all reasonable inferences in favor of the non-moving party. *National Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir.1997). Merely alleging the existence of a factual dispute is insufficient to defeat a summary judgment motion; rather, there must exist in the record a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Additionally, we review issues of statutory interpretation *de novo*. *United States v. Moore*, 73 F.3d 666, 668 (6th Cir.1996) (per curiam).

## III.

Looking anew at the text, structure and legislative history of the statutory provi-

---

**2.** Antoinette has acted as next friend for Ethan Walton, rather than as a plaintiff herself. She does not challenge the termination of her FSA benefits in this lawsuit.

sions to derive Congress's purpose regarding the relevant language, we affirm the district court's summary judgment in favor of plaintiffs.

The outcome of this case hinges on the interplay of two distinct statutory provisions enacted in 1996: (1) § 6(i)(2) of the FSA and (2) Part A of Title IV of TANF. First, we must construe the meaning of § 6(i)(2) of the FSA, 7 U.S.C. § 2015(i)(2), as enacted by § 1819 of PRWORA, P.L. 104–193. Section 6(i)(2) allows for the application of rules and procedures enumerated under Part A of Title IV of TANF to the administration of disqualifications under the food stamp program:

**(i) Comparable treatment for disqualification**

**(1) In general**

If a disqualification is imposed on a member of a household for a failure of the member to perform an action required under a Federal, state, or local law relating to a means-tested public assistance program, the *State agency may impose the same disqualification on the member of the household under the food stamp program.*

**(2) Rules and procedures**

If a disqualification is imposed under paragraph (1) for a failure of an individual to perform an action required under part A of Title IV of the Social Security Act (42 U.S.C. [§ ] 601 et seq.), *the State agency may use the rules and procedures that apply under part A of Title IV of the Act to impose the same disqualification under the food stamp program.*

7 U.S.C. § 2015(i)(1), (i)(2) (West Supp. 1999) (emphasis added).

We also must scrutinize part A of Title IV of TANF itself, referenced by the provision above, which sets forth penalties for a parent's non-cooperation in establishing paternity for her minor child or children:

**(a) In General**

**(2) Reduction or elimination of assistance for noncooperation in es-**

**tablishing paternity or obtaining child support**

If the agency responsible for administering the State plan ... determines that an individual is not cooperating with the state in establishing paternity or in establishing, modifying or enforcing a support order with respect to a child of the individual, and the individual does not qualify for any good cause or other exception established by the State pursuant to section 654(29) of this title, then the State-

**(A)** shall deduct from the assistance that would otherwise be provided to the family of the individual under the State program funded under this part an amount equal to not less than 25 percent of the amount of such assistance; and

**(B)** *may deny the family any assistance under the State program.*

42 U.S.C. § 608(a) (West Supp.1999) (emphasis added).

Defendant argues that together, these statutes allow Michigan to disqualify the Walton household from receiving all FIP (TANF) benefits, as well as all FSA benefits, due to the finding that Antoinette failed to cooperate in establishing Te'Asha's paternity. Although the statute is not altogether clear on its face, in light of the textual evidence that does exist, as well as legislative history that we find persuasive, we disagree with defendant's construction of these provisions.

**A. Statutory Text and Structure**

"The best evidence of [a statute's] purpose is the statutory text adopted by both Houses of Congress and submitted to the President." *West Virginia Univ. Hosps., Inc. v. Casey,* 499 U.S. 83, 98, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). *See also Group Life & Health Ins. Co. v. Royal Drug Co., Inc.,* 440 U.S. 205, 210, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) ("[T]he starting point in any case involving the meaning of a statute [ ] is the language of

the statute itself."); *Parker–Hannifin v. Commissioner of Internal Revenue,* 139 F.3d 1090, 1095 (6th Cir.1998) ("We begin with the language of the statute itself, and interpret it according to its plain language absent evidence of a contrary legislative intent. . . ."). The meaning of a statute's words can also be "enlightened by their context and the contemporaneous legislative history," as well as the "historical context of the statute." *Edwards v. Aguillard,* 482 U.S. 578, 594–95, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). Using these tools of interpretation, we find that the text of the statutory provisions involved weighs heavily in favor of the plaintiffs. Where the provisions are ambiguous on their face, we find that the legislative history conclusively shows that the MFIA's termination policy contravenes Congressional intent.

Defendant's textual arguments largely fail to pass muster. First, the crucial provision involved, 7 U.S.C. § 2015(i), nowhere expressly provides for disqualification of an entire family's food stamp benefits because of one family member's failure to meet a Federal, state or local law. To the contrary, the language of that provision explicitly applies to individual members of a household. The first paragraph of that provision provides that if a disqualification is imposed "on a *member* of a household for a failure of the *member* to perform an action required under Federal, state, or local law," then the State "may impose the same disqualification on the *member* of the household under the food stamp program." 7 U.S.C. § 2015(i)(1) (emphasis added).

Facing this textual clarity in paragraph (1),[3] defendant argues that § 2015(i)(2) provides states with the ability to deny food stamps to the entire household. This argument comes in four stages. First, defendant contends that paragraph (2) supplements paragraph (1) substantively,

adding another source from which to determine who can be disqualified and under what circumstances; in defendant's words, it offers an additional state option that "applies only to *joint recipients* of food stamps and means-tested public assistance benefits provided under Title IV–A." Defendant's Br. at 12 (emphasis added and deleted). Second, defendant contends that paragraph (2) allows household sanctions to be imposed against this separate class of disqualifications (*ie.,* "joint recipient" disqualifications) even when they are not appropriate for the broader class of disqualifications described under paragraph (1). The evidence defendant proffers here is that paragraph (2) does not use the words of limitation ( "member of the household") couched in paragraph (1). Defendant's Br. at 13. Third, defendant argues that Part A of Title IV of TANF, referenced in paragraph (2), allows for the disqualification of household benefits when individuals fail to cooperate in paternity matters, so the "same disqualification" should apply to food stamps through § 2015(i)(2). Finally, defendant argues that states are permitted to apply their own all-household sanctions because paragraph (2) does not "limit[ ] 'rules and procedures' to federal or Congressional rules." Defendant's Br. at 16.

Although the plain meaning of the statutory provisions alone does not settle all of defendant's arguments, it severely undermines them on most fronts. First, defendant's initial contention confuses the role of paragraph (2) within the broader provision. The text and structure of § 2015(i) indicate that paragraph (2) is meant to guide the selection of the "rules and procedures" a state agency can adopt in effecting the disqualifications defined and permitted by paragraph (1). We find there is neither an express nor an implied suggestion that paragraph (2) provides a separate substantive fount for determining who may

---

**3.** Defendant concedes that paragraph (1) "specifically limits the resulting food stamp disqualification to 'the member of the house-

hold.' " Defendant's Br. at 13 (emphasis deleted).

be permissibly disqualified above and beyond paragraph (1). Congress left express clues of this limited procedural role of paragraph (2). First, paragraph (1) bears the heading "In general" while paragraph (2) is labeled "Rules and procedures." Furthermore, Congress expressly limited paragraph (2) to those occasions when "a disqualification is imposed under paragraph (1) ...." § 2015(i)(2). It follows from both the headings and the express limitation of paragraph (2) that Congress intended paragraph (1) to establish the substantive rule of who may be disqualified under § 2015(i) and under what circumstances, while the latter determines how they are to be disqualified (*ie.*, using the "rules and procedures that apply under Part A of Title IV of the Act"). Thus, paragraph (2), like paragraph (1), appears to apply only to individual family member disqualifications.

Second, defendant founders when she argues that paragraph (2) permits household sanctions despite the restrictions in paragraph (1) because it does not possess the "words of limitation" of the prior paragraph. First, as stated *infra*, such limiting words were unnecessary, as paragraph (2) is expressly limited to disqualifications properly imposed under paragraph (1)-and such disqualifications are limited to individual disqualifications. More fundamentally, when we heed the Supreme Court's wisdom that "[t]he plain meaning that we seek to discern is the plain meaning of the whole statute, not of isolated sentences," *Beecham v. United States,* 511 U.S. 368, 372, 114 S.Ct. 1669, 128 L.Ed.2d 383 (1994), defendant's argument wholly collapses. Examined within the broader statutory scheme, the precise use of the word "member" in § 2015(i)(1), the reference to that paragraph in § 2015(i)(2), the use of the word "individual" in § 2015(i)(2), and the simultaneous absence of any mention of a "household" disqualification in either paragraph, are particularly illuminating. Throughout § 2015, Congress spoke precisely as to when it intended a provision to apply to individuals who are members of households, to households, or to both. Most notably, in 7 U.S.C. § 2015(*l*), Congress provided that no individual *parent* who was non-cooperative in establishing paternity or obtaining child support could be eligible for child support allotments; importantly, the provision does not affect any other members of that parent's household.[4] Other examples abound of Congressional explicitness in delineating which recipients (individuals or households) are to be impacted by various provisions. *See, e.g.,* 7 U.S.C. § 2015(a) (discussing requirements on both "households and individuals who are members of eligible households"); *id.* at § 2015(c) (disqualifying households for refusing to cooperate in providing necessary information to a state agency); *id.* at § 2015(j) & (k) (deeming individuals ineligible when they provide fraudulent statements or are fleeing from prosecution); *id.* at § 2017(d) (allowing food stamp benefits to be reduced for households). Congress was equally clear when it intended the transgressions of a member of a household to render ineligible the entire household. *See* 7 U.S.C. 2015(d)(1)(B) (providing, under a separate

---

**4.** Defendant stretches her argument to a breaking point by suggesting, both here and elsewhere, that we should not grant any interpretive weight to § 2015(*l*) because it applies to a different set of assistance recipients-"*food stamp-only* cases." Defendant's Br. at 20; *see also* Defendant's Br. at 11-12 (stating that the difference between § 2015(i)(1) and (i)(2) is that the latter provides an additional state option that "applies only to *joint recipients* of food stamps and means-tested public assistance benefits provided under Title IV-A." (emphasis added and deleted)). First, no-

where does the statute draw this fine distinction between "food stamp-only" recipients and "joint recipients." Moreover, the suggestion that Congress, in the name of harmonization, punishes more harshly (for the very same member transgression, with respect to the very same benefits) those households faring poorly enough that they qualify for *multiple* modes of welfare assistance, than it does families who receive only FSA assistance, defies reason. We hesitate to attribute this motivation to Congress without more explicit proof.

subsection labeled "Household ineligibility," that a household becomes ineligible when the head of the household fails to meet certain work requirements). Moreover, when disqualifying entire households for one member's actions, the statute is not just explicit, but also provides specific safeguards. For example, in erecting a household sanction for a member's failure to meet work requirements, the law limits the household's ineligibility to a period no greater than the shorter of 180 days or the length of the individual's ineligibility. *Id.* Further, Congress erected a strict 25 percent ceiling on the amount by which a state can reduce the allotment of food stamps to a household due to the failure of a member of a household to perform an action required by law. *See* 7 U.S.C. § 2017(d)(1)(B).

To assume, as defendant does, that Congress detoured from this consistent and explicit precision and care in only § 2015(i)-and did so through the back door route of the "rules and procedures" paragraph of that provision-defies the remainder of § 2015 and basic principles of statutory interpretation. *See Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (" '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' ") (citation omitted; brackets in original). In other words, defendant-by arguing that the lack of an express limitation to individual sanctions opens the door to household sanctions-has improperly turned the required analysis on its head.

Indeed, given the explicit nature of the portions of the statute that levy all-household sanctions, paragraph (2)'s *failure* to mention the all-household sanction indicates that such a sanction was *not* intended.[5]

Third, defendant errs when she asserts that paragraph (2) provides a *carte blanche* to state agencies to apply their own administrative rules in administering food stamp disqualifications simply because "[n]othing [in the paragraph] limits 'rules and procedures' to federal or Congressional rules." Defendant's Br. at 16 (emphasis deleted). Once again, the logic of *Russello*— that we should presume that Congress intended to exclude certain language when it included the same language elsewhere in a statute, *see* 464 U.S. at 23, 104 S.Ct. 296—defeats defendant's argument here. The statute indicates expressly when it incorporates by reference state laws and rules; § 2015(i)(1), for instance, calls upon the failure of individuals to comport with "Federal, State, or local law relating to a means-tested public assistance program." 7 U.S.C. § 2015(i)(1). *See also* 7 U.S.C. § 2017(d)(1)(providing that the benefits of a household can be reduced "under a Federal, State or local law relating to a means-tested public assistance program"). Because it does not reference state or local law in paragraph (2), but instead calls specifically on the "rules and procedures that apply under part A of Title IV of the Act," Congress intended only to reference 42 U.S.C. § 608(a), not state law. This paragraph can not be construed as an invitation for states or localities to apply their own rules.

---

**5.** Equally unavailing is defendant's contention that plaintiffs' proposed reading of paragraphs (1) and (2) renders the latter superfluous. Defendant's Br. at 13. To the contrary, the "rules and procedures" paragraph performs the exact role its heading and text suggests: it allows states to apply TANF rules and procedures in imposing disqualifications in the food stamp program. Without the paragraph, states would need to apply the panoply of more restrictive food stamp rules and regulations. *See, e.g.,* 7 U.S.C. § 2020(e)(10) (requiring notice and certain information to be provided before termination of food stamps, and requiring the continuation of food stamp benefits if an administrative hearing is required). Thus, the paragraph plays an important role in the disqualification scheme and achieves some of the "harmonization" the overall scheme intended.

Despite this bevy of structural and textual evidence weighing against defendant's reading, an ambiguity remains on the statute's face. Defendant correctly points out that Part A of Title IV of TANF, referenced by paragraph (2), indeed allows the outright elimination of household benefits for the failure of a member to cooperate in establishing paternity. *See* 42 U.S.C. § 608(a)(2)(A) & (B) (requiring states, in the event that an individual does not cooperate in establishing paternity, to deduct at least 25 percent from assistance to the family, and allowing states to "deny the family any assistance under the State program"). The provision thus contradicts the clear textual evidence against household disqualifications discussed *infra*. It also contradicts 7 U.S.C. § 2015(*l*), the specific FSA provision addressing non-cooperation in establishing paternity. In § 2015(*l*), Congress provided that no individual *parent* who was non-cooperative in establishing paternity or obtaining child support could be eligible for child support allotments, leaving the rest of the household's FSA benefits intact.

Although the district court attempted to resolve this contradiction through other textual arguments, we cannot agree with its conclusions. First, it labeled § 608(a)(2)(B) a non-mandatory "option," as opposed to a "rule," because it provides that states "*may*" deny the household any assistance after non-cooperation. Hence, the court concluded that the reference in § 2015(2) to "rules and procedures" does not refer to the "option" in § 608(a)(2)(B). *See* J.A. at 52–53. We do not find this distinction convincing. Permissive rules are commonplace in the law, yet are still properly labeled "rules." Moreover, § 608(a)(2) certainly could fall under the

broader term "procedure," also referenced in § 2015(i)(2).

We also find unpersuasive the lower court's second textual route around the ambiguity—that the distinction between assistance "reductions" and "disqualifications" renders § 608(a)(2) inapplicable. Indeed, the FSA at numerous points treats the two sanctions distinctly. *See, e.g.,* 7 U.S.C. § 2015(i)(3) (using "disqualification" as a synonym for ineligible, and allowing disqualified individuals to re-apply as "new applicant[s]"); 7 U.S.C. § 2017(d)(1)(b) (limiting the "reduction" of an allotment of food stamps to no more than 25 percent). Having made this distinction, the district court concluded that § 608(a)(2)(A) & (B) imposed "reductions" in allotments,[6] not outright disqualifications, and therefore could not be incorporated under 7 U.S.C. § 2015(i)(2).[7] Despite the tempting logic of this position, we cannot hold that it conclusively emerges from the "plain meaning" of the text itself. For instance, it is not clear even under the district court's own standards that § 608(a)(2) can be so cleanly labeled a "reduction" provision. The heading of that paragraph includes the phrase "elimination of assistance," and also provides that the state may deny a family assistance altogether. 42 U.S.C. § 608(a)(2)(B). Such a penalty could reasonably be construed as a denial of eligibility, or disqualification, as much as the other provisions under § 608(a) that mandate "no assistance" under other conditions (and which the district court comfortably labeled disqualification provisions).

#### B. Legislative History

---

**6.** The court argued that § 608(a)(2) comprises a reduction provision because it imposes punishment on *eligible* persons in the form of reductions from 25 to 100 percent, while the other provisions of § 608(a) comprise *disqualification* provisions in that they "reject eligibility outright." J.A. at 57 (emphasis deleted).

**7.** The court advanced two arguments to that effect. First, if § 608(a)(2)(A) & (B) are considered reduction provisions, then they can not be referenced by § 2015(i)(2), a provision dealing with the distinct sanction of disqualification. Second, any reduction would be governed by the 25 percent limitation on reductions imposed by 7 U.S.C. § 2017(d).

Given this latent ambiguity,[8] we must turn to a consideration of legislative history and intent to divine Congressional purposes. *See Difford v. Secretary of Health & Human Servs.*, 910 F.2d 1316, 1318 (6th Cir.1990) ("Where statutory language is ambiguous, the courts should review the legislative history in conjunction with the statutory provision at issue.") (citing *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). Examining the textual ambiguity in light of this broader context and legislative history, we hold that Congress did not mean for states to eliminate household food stamp allotments in the fashion undertaken by defendant.

PRWORA's reform of the FSA comprised a delicate balancing act. Among the goals listed by the House Committee on Agriculture designing the reforms was "the retention of the Food Stamp Program as a *'safety net'* at the *federal level*." H.R. Rep. 104–881 (104th Cong., 2d Sess. January 2, 1996) (emphasis added). At the same time, the committee stated that the reforms were intended to expand states' role in administering the FSA "by broadening their authority to harmonize the [program] with other welfare programs." *Id.* Clearly, Congress sought to balance this added state discretion to "harmonize" with the preservation of a federal "safety net" for food assistance, girded by federally imposed rules and guidelines. Neither goal absolutely trumps the other and, in-

deed, much of the complexity of the provisions in question arises from this difficult balancing effort. For instance, unlike the PRWORA's wholesale replacement of the federally-controlled AFDC with a block-grant regime, PRWORA did not alter the basic national standards of eligibility for FSA assistance that have long been in place, and gave no control over such standards to states. *See* 7 U.S.C. § 2014. Congress also left intact the complex array of federally-imposed administrative requirements to which states must adhere. *See* 7 U.S.C. § 2020.[9]

Most importantly for this case, a crucial aspect of the "safety net" that Congress retained is the concern for the well-being of dependent minor children under the FSA. Numerous FSA provisions carve out safeguards for these children's interests—safeguards states can not trammel. In determining eligibility for assistance, for instance, the FSA provides added benefits to support families with children. *See* 7 U.S.C. § 2014(e)(3)(A) (allowing deductions in calculated income for dependent children); *id.* at § 2014(e)(4)(A) (allowing deductions for child support payments). Likewise, in rendering disqualifications, FSA pursues policies intended to benefit dependent children. Of course, the very rationale for which Antoinette is being penalized in this case-failing to protect adequately the interests of Te'Asha by identifying her father in order to secure child support-stems from a concern for the wel-

**8.** We also find that the parties' disagreement over the language of 7 U.S.C. § 2020(i)(2)—addressing the exception to a general prohibition on termination of household benefits—and the possible contradiction between that provision and plaintiffs' interpretation of § 2015(i), reveal another ambiguity not resolvable by examining the statute's plain text alone.

**9.** By emphasizing only the increased control given to states, *see* Defendant's Br. at 28–29, and arguing that plaintiffs' interpretation would "undercut an express Congressional rationale for implementing food stamp reform," id. at 29, defendant neglects the careful balancing taking place. The argument also ignores the fact that to achieve this bal-

ance, a host of FSA provisions cut against state discretion in favor of retaining certain federal safeguards. *See, e.g.,* 7 U.S.C. §§ 2014 & 2020. In sum, by both its words and its deeds, Congress made clear that harmonization was not the all-consuming goal that defendant has characterized it to be. *See generally Rodriguez v. United States*, 480 U.S. 522, 526, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987) (per curiam) ("Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be law.").

fare of the children who depend on her. Just as under TANF, Congress disqualifies from FSA assistance any custodial parent who is non-cooperative in establishing paternity or obtaining child support for the child. 7 U.S.C. § 2015(*l*)(1). Unlike under TANF, however, family allotments are not affected by this provision. Further, any determination that an exception to disqualification for non-cooperation should be granted for "good cause" is to take into account the "best interests of the child." 7 U.S.C. § 2015(*l*)(2). Similarly, the FSA protects children by rendering ineligible non-custodial parents who fail to cooperate in establishing the paternity of a child, or who fail to provide child support, *see* 7 U.S.C. § 2015(m)(1), as well as individuals who are delinquent in paying court-ordered child support. *See* 7 U.S.C. § 2015(n). Finally, the statute provides an exception to its work and work program requirements for FSA support when an individual is "a parent or other member of a household with responsibility for the care of a dependent child...." 7 U.S.C. § 2015(d)(2)(B); *see also* 7 U.S.C. § 2015(*o*)(3)(C).

Finally, Congress's concern for innocent minor children can be seen in the care Congress took in discerning between individual sanctions and household sanctions, which deprive innocent, dependent children of FSA benefits. As described *supra*, the FSA carefully distinguishes provisions which affect individual members from those affecting whole households, and erects safeguards when it does intend for the transgressions of a member of a household to render ineligible the entire household. *See, e.g.*, 7 U.S.C. § 2015(d)(1)(B); 7 U.S.C. § 2017(d)(1)(B). This care is warranted given the general principle, expressed by the Supreme Court in different contexts, that "visiting [ ] condemnation on the head of an infant" is generally ineffectual and unjust, because while "parents have the ability to conform their conduct to societal norms, [ ] their [ ] children can affect neither their parents' conduct nor their own status." *Trimble v. Gordon,* 430 U.S. 762, 769–70, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977) (quoting *Weber v. Aetna Cas. & Sur. Co.,* 406 U.S. 164, 175, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972)); *see also Plyler v. Doe,* 457 U.S. 202, 220, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) ("[L]egislation directing the onus of a parent's misconduct against his children does not comport with fundamental conceptions of justice.").

The legislative history demonstrates that Congress adhered to these broader concerns when it considered and enacted the language of § 2015(i)(2) in particular. First, the history shows clear Congressional intent to raise a federal bar below which no state can venture in disqualifying food stamp benefits; second, it shows a continuing concern for children's welfare under FSA and the PRWORA reforms to the FSA. The path of the language that ultimately became § 2015(i) is clearly marked. First, on August 4, 1995, the following provision-applying only to *household members*-was introduced in the Senate:

(A) IN GENERAL—Section 6 of the Food Stamp Act of 1977 (7 U.S.C.2015) is amended—

(1) by redesignating subsection (i) (as added by section 106) as subsection (*o*); and

(2) by inserting after subsection (h) the following:

"(i) COMPARABLE TREATMENT FOR DISQUALIFICATION—"

"(1) IN GENERAL.—If a disqualification is imposed on a *member of a household* for a failure of the *member* to perform an action required under a federal, state, or local law relating to a welfare or public assistance program, the state agency may impose the same disqualification on the *member of the household* under the food stamp program."

"(2) APPLICATION AFTER DISQUALIFICATION PERIOD—A *member of a household* disqualified under paragraph (1) May, after the disqualification period has expired, ap-

ply for benefits under this act and shall be treated as a new applicant, except that a prior disqualification under subsection (D) shall be considered in determining eligibility."

Cong. Rec. S12449 (1995). (emphasis added). On September 8, 1995, Senator Faircloth submitted a proposal to amend the language in S.1120 to apply expressly *to entire households:*

> (i) COMPARABLE TREATMENT UNDER SEPARATE PROGRAMS.—
> (1) IN GENERAL.-If a disqualification, penalty or sanction is imposed on a *household or part of a household* for a failure of an individual to perform an action required under a Federal, State, or local law relating to a welfare or public assistance program, the State agency may impose the same disqualification, penalty, or sanction on the *household or part of the household* under the food stamp program using the rules and procedures that apply to the welfare or public assistance program.

Cong. Rec. S12940 (1995). Rather than opting for this amendment, Congress ultimately adopted the language that emerged in a September 14 amendment which altered the "Faircloth Amendment." Specifically, the modified amendment left the original language of § 2015(i)(1) intact, and inserted the "Rules and Procedures" language that emerged as law in § 2015(i)(2). Cong. Rec. S13573. Notably, the modified amendment removed all references to "households" which had appeared in the original Faircloth Amendment. *See id.* Only the reference to individual "members" remained.

The rejection of the proposed "Faircloth Amendment" in favor of the language ultimately adopted is telling.[10] That amendment most certainly would have permitted an entire household's food stamp allotment to be disqualified, presumably even for a single household member's transgressions, if the relevant TANF rules and procedures so mandated. In light of the care taken by Congress in indicating when entire households versus individual members were implicated by a given provision, *see infra* § III.A, the rejection of the original Faircloth language for language singling out only "members" indicates a clear choice by the enacting legislators to eschew the household language, and thus, the household sanction. *Cf. Democratic Senatorial Campaign Committee,* 454 U.S. at 35, 102 S.Ct. 38 (concluding that a substantial "inference can be found in the rejection by the 96th Congress of an amendment that would have expressly" provided for the rule sought). Once again, this shift in language is consistent with the rest of § 2015 in that it carefully treated the occasions where households are penalized for a member's failure to follow certain rules. *See infra* § III.A.

Defendant stumbles upon faulty argumentation in attempting to explain away this crucial evidence of legislative intent. Brushing aside the importance of the decisive removal of the term "household" from the original Faircloth Amendment, defendant casts the progression through the three provisions as a short journey toward compromise: starting with "comparable individual disqualifications," moving to "comparable household disqualifications," and finally resulting in a dichotomous treatment where joint TANF/food stamp recipients face comparable *household* disqualifications, while all other recipients face only *individual* disqualifications. *See* Defendant's Br. at 31–32. This comprises mere bootstrapping of defendant's textual argument-indeed, it is not legislative history at

---

10. Courts often scrutinize the rejection of amendments and the choice of particular language over other proposed language to derive the legislative purpose behind the statute ultimately adopted. *See, e.g., Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 726–27, 109 S.Ct.

2702, 105 L.Ed.2d 598 (1989); *United States v. Yermian,* 468 U.S. 63, 72–73, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984); *Federal Election Comm'n v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 36, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981).

all. To put it simply, defendant is stubbornly relying upon her interpretation of the text's plain meaning (namely, that the class of "joint recipients" is alone subject to household disqualification for non-cooperation) to argue that the legislative history shows that Congress, *simply by adopting that language,* intended to impose household sanctions on joint recipients. The circularity of this approach is plain to see, and renders it unpersuasive.

Contrary to defendant's claims, we believe that the decisive legislative history and evidence of broader legislative intent, coupled with the plethora of textual evidence cited in § III.A, *infra,* resolve the ambiguity of the provisions in favor of plaintiffs' interpretation.

### C. Agency Deference

Plaintiffs and defendant have argued that interpretations of the relevant provisions by the United States Department of Agriculture ("USDA") and by the implementing state agency merit our deference under *Chevron* principles. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Because the "traditional tools of statutory ·construction" have allowed us to derive a clear meaning to the statute, the USDA statements interpreting the food stamp provisions consistent with our reading are not relevant to our holding, and therefore receive no *Chevron* deference. *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987).[11] Similarly, defendant's argument that we must adhere to *Smith v. Babcock,* 19 F.3d 257 (6th Cir. 1994) by deferring to the implementing state agency's interpretations is equally inappropriate. *See* Defendant's Br. at 34–35. *Babcock* was based on principles of deference emerging from the *Chevron* doc-

trine. *See Babcock,* 19 F.3d at 261 (citing *Chevron,* 467 U.S. at 843–44, 104 S.Ct. 2778). Once again, because the "apparent statutory ambiguity can be resolved using 'traditional tools of statutory construction,'" *Chevron* deference is not appropriate. *Mid–America Care Found. v. NLRB,* 148 F.3d 638, 642 (6th Cir.1998) (quoting *Cardoza–Fonseca,* 480 U.S. at 446, 107 S.Ct. 1207). We therefore need not address the parties' arguments regarding the level of deference owed to either the USDA or MFIA interpretations.

### IV.

Because we conclude that the text and legislative history of the PRWORA reforms indicate clear Congressional intent against permitting the disqualification of a household's FSA benefits when a member of that household is found non-cooperative regarding issues of paternity, we **AFFIRM** the district court's decision.

---

11. The USDA concluded in a November 19, 1997 memorandum to regional directors of the Food Stamp Program that "the best reading of the [comparable disqualification provision] is that disqualifications under Section 819 should only be applied to the individual," J.A. at 129, and advised those directors to inform state agencies imposing all-household disqualifications that "we believe that these sanctions are not supported by the law...." *Id.* No regulations have been issued by the USDA.