**Jim HODGES, et al., Plaintiffs,**

v.

**Donna SHALALA, et al., Defendants.**

**No. 3:00–2048–17.**

United States District Court,
D. South Carolina,
Beaufort Division.

Oct. 24, 2000.

Marcus Manos, Wilburn Brewer, Jr., Susan Batten Lipscomb, of Nexsen, Pruet, Jacobs & Pollard, LLP, Columbia, SC, for plaintiffs.

Deborah B. Barbier, Robert F. Daley, Jr., U.S. Attorney's Office, Columbia, SC, Robert E. Keith, U.S. Dept. of Health and Human Services, Washington, DC, for defendants.

## ORDER

JULIAN ABELE COOK, Jr., District Judge.

The State of South Carolina ("State"),[1] as well as other persons, filed this lawsuit in an attempt to prevent the United States from penalizing it for failing to meet certain conditions that were tied to its receipt of federal money. Specifically, the State accepted funds from the United States under the Temporary Assistance to Needy Families Program ("TANF") upon the conditions that it would (1) implement and maintain a centralized computer system, with which to track those persons who are responsible for paying child support, and (2) create a central child-support disbursement unit. Although substantial efforts were made by the State to comply with its obligations under TANF, its attempts have not yet met with success.

The State has asked the Defendant, Donna Shalala, in her official capacity as the Secretary of the United States Department of Health and Human Services ("Department"), to exercise her discretion and grant it an opportunity to comply with the TANF requirements at a later time without incurring any substantial penalty. According to the pleadings, there are indications that Shalala will not grant the State's request because, in her opinion, she does not possess any discretionary authority to do so. Thus, the purpose of this litigation is to determine the limits, if any, of the Secretary's discretion and, in the meantime, to forestall the issuance of an administrative decision that might terminate the State's ability to elect a lesser alternative penalty.

The parties have deemed this case to be one of substantial importance to them since hundreds of millions of dollars, as well as the balance of power between the federal and state governments, are at stake. Unfortunately, because of the nature of these grants, many of the poorest residents of South Carolina are caught in the middle of this dispute.

On August 11, 2000, Secretary Shalala filed a motion to dismiss the lawsuit.[2] On

1. Although South Carolina's governor, Jim Hodges, is the lead Plaintiff in this case, the Court will refer to the State as the primary claimant for reasons of rhetorical consistency in light of the jurisdictional findings that are set forth in Section IV.

the same day, the State filed a motion for a second preliminary injunction. For the reasons that are set forth below, Shalala's motion is granted and the State's motion is denied.[3]

I

The history surrounding this case is generally undisputed. The nonpayment of child support has been a continuing problem in the United States for several decades. *See generally* Deborah L. Rhode, *Feminism and the State*, 107 Harv. L.Rev. 1181, 1200 (1994) ("Inadequate child-support standards and enforcement structures . . . result in large financial gaps between custodial and non-custodial households. . . . Of all noncustodial fathers, less than half provide any child support and, of those under court order, only half pay the full award. Although some of these men are themselves impoverished, the majority are in a position to contribute to their children's welfare."). Although once considered an issue of local family law, the problem has taken on national dimensions. *See, e.g.,* 132 Cong. Rec. S5303–04 (1986) (statement of Sen. Bradley) ("Child poverty in this country has reached alarming proportions. One in four children under the age of 5 is living in poverty. In single parent families, the figure is more staggering, with approximately one-half living below the poverty line. In my home State of New Jersey, 22 percent of households with children under 18 are headed by a single parent. In New Jersey, $44 million is paid monthly in AFDC payments, with only about 10 percent recouped through child support payments.").

Given the particularly harsh effects of nonpayment on poor families, the federal and state governments, including that of South Carolina, have long cooperated in an attempt to assure that those children and parents, who live in poverty and are entitled to receive child support, get the necessary private and public assistance. In 1975, Congress initiated a series of aggressive steps to remedy such nonpayment when it passed the Child Support Enforcement Act, Title IV, Part D of the Social Security Act, 42 U.S.C. §§ 651–669 (1975) [hereinafter *Title IV–D* ]. Therein, it created an enforcement program that would be (1) prescribed and administered by the federal government as a prerequisite to the receipt of any enhanced federal funding, and (2) operated by the states.

Following the enactment of this Act, South Carolina acted quickly to come into compliance with these initial requirements. By 1976, the State had devised and implemented a uniform family court system to address the situation. The program was to be administered by each of the forty-six county clerks of the State's courts. In reliance upon local knowledge and relationships, the system was able to satisfy most claims for payment within a period of twenty-four hours.

However, as time passed, Congress developed a different view as to the effectiveness of the state-run systems—especially with regard to interstate enforcement efforts. *See, e.g.,* 132 Cong. Rec. S5303–04 (1986) (statement of Sen. Bradley) ("What often happens is that the noncustodial parent, for a variety of reasons, moves to another State. At that point, child support enforcement efforts too frequently confront serious problems. The noncustodial parent frequently ceases to pay child support and a large debt accrues. Soon the debt is out of hand and the noncustodial parent seeks relief from this debt."). Hence, Congress enacted the Family Support Act in 1988, in which it amended *Title IV–D* to require all of the participating states to create and maintain automated computer systems that would facilitate enforcement. The federal government pro-

---

**2.** Alternatively, she seeks the entry of a summary judgment in her favor pursuant to Federal Rule of Civil Procedure 56.

**3.** The date upon which this Order shall be effective is set forth below in Section IX.

vided matching funds at a rate of ninety (90) percent during the development phase of the project, and the State contracted with the Unisys Corporation ("Unisys") to build the system.

In or around 1996, two events dramatically changed the relationship between the State and the Secretary. First, the State alleges that it learned for the first time that Unisys had failed to fulfill its contractual obligations to build a system that would meet federal standards. In the opinion of the State, the failure by Unisys was an act of "actual fraud." (Pls.' Mem. Opp'n Mot. Dismiss at 3.) As a result of these ostensible misdeeds, the State was falling out of compliance with federal regulations. At about the same time, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, which further amended the conditions under *Title IV–D* by requiring the states' enforcement systems to be centralized and statewide in nature.

The 1996 amendment was part of a broad reaching attempt by Congress to overhaul the federal government's public assistance program and supplant it with the TANF Program. Under the TANF Program, the participating states would receive federal block grants to design their own public assistance programs in exchange for their agreement to (1) work toward federal program goals, and (2) satisfy a series of effort and performance requirements. These federal monies were to be distributed to the poorest families within each participating state so that its recipients could obtain the basic necessities of life. The parties agree that in order for a state to receive this funding, it must have a *Title IV–D* plan that has been approved by the federal government.[4] *See* 42 U.S.C. §§ 602(a)(2), 655(a)(1) (2000).

In 1998, the relationship between the State and the federal government became more complicated. On January 27 of that year and despite the State's allegations of fraud by Unisys, the Secretary sent a notice of her intent to disapprove its child-support enforcement systems. Additionally, Congress enacted the Child Support Performance and Incentive Act of 1998. Therein, it created a graduated financial penalty system, which could be adopted by a participating state in lieu of a disapproval of its plan by the Secretary (i.e., for its failure to have an automated data processing or disbursement system in place on the prescribed date). The State has only requested the alternative penalty with respect to a condition that it have a centralized payment-disbursement system. However, it did not accept the alternative penalty with respect to its statewide data and information system, even though such system is admittedly noncompliant with the statute.

Thereafter, the Secretary designated a presiding officer to make recommended findings and a proposed decision that would address the State's data system plan. On May 18, 2000, the presiding officer issued, among other things, the following recommended findings: "that having an automated system in effect is a requirement for approval of a state IV–D plan, and that [the Administration for Children and Families] has not been shown to have the authority to excuse South Carolina's conceded failure to comply with the automated system requirement by fashioning some sanction short of disapproval in its state IV–D plan." (Defs.' Mem. Supp. Mot. to Dismiss Ex. A at 2; Pls.' Opp'n Mot. Dismiss Ex. J at 3.) On the basis of these recommended findings, the presiding officer proposed the disapproval of the State's *Title IV–D* plan. (Defs.' Mem. Supp. Mot. to Dismiss Ex. A at 17; Pls.' Opp'n Mot. Dismiss Ex. J at 18.) This

---

4. Here, the pleadings suggest that the State has been unable to meet these conditions because of the alleged contractual default by Unisys. Thus, it arguably stands to lose the entirety of its TANF funding for the next fiscal year if it does not submit a plan that will certify that it is operating an automated system as mandated by federal law.

lawsuit followed.[5] After an Assistant Secretary issued a brief statement on August 9, 2000, in which the Secretary was advised to reach the same conclusion, (Defs.' Mem. Supp. Mot. to Dismiss Ex. B), the parties filed the instant motions.

The monetary sums at stake in this case are substantial. If the alternative penalties are elected, the parties agree that the State must pay up to $6,396,506 for fiscal year 2000, approximately $5,920,007 for fiscal year 2001, and $7,104,009 for each subsequent fiscal year in which a federal certified child support collection system is not in place. (Defs.' Mem. Supp. Mot. to Dismiss Ex. C at 17; Pls.' Opp'n Mot. Dismiss Ex. K at 18.) On the other hand, the State can continue with its administrative appeal and await the Secretary's final order. If the Secretary rejects the presiding officer's proposed decision, the State probably will prevail. Otherwise, it (1) can no longer elect the alternative penalty and (2) could suffer the loss of $123,647,856 for fiscal year 2000, $126,489,460 for fiscal year 2001, and $129,672,056 for fiscal year 2002. (Pls.' Opp'n Mot. Dismiss Ex. D at ¶ 16.)

## II

The State brought this case in an effort to obtain declaratory and injunctive relief. The Complaint, in part, incorporates allegations that Congress exceeded its power under the Spending Clause, U.S. Const. art. 1, § 8, cl. 1, when it required the several states to adopt the child support enforcement mechanisms at issue. As such, the State maintains that Congress encroached upon those powers that were reserved to the states and individuals by the Tenth Amendment. The State also argues that the failure of Congress to afford it and its citizens a meaningful judicial hearing for the impending deprivation of federal funds constitutes a violation of the Due Process Clause of the Fifth Amendment. In response, Secretary Shalala filed a motion to dismiss the case. In her pleadings, she argues that the State must exhaust certain administrative remedies before obtaining judicial review and, in any event, the Constitution and federal law do not entitle it to the requested relief.

While considering the parties' arguments, the Court raised other jurisdictional questions as to whether this action is cognizable and justiciable.[6] For the rea-

---

5. The Complaint asserts eight counts. Count I seeks a declaration that, in cases of noncompliance, the Secretary has the discretion to impose a sanction which is less than a full plan disapproval. Count II asks the Court to declare that an evidentiary hearing is warranted as to the State's reasons for its noncompliance (just in case the Secretary has the discretion that is the subject of Count I). Count III requests a determination that the conditions of *Title IV–D* are not rationally related to the articulated purpose of the statute. Count IV alleges that the federal government has breached an implied contract with the State by disregarding a covenant of good faith and fair dealing. Counts V and VI argue that the conditions of *Title IV–D* violate the Spending Clause and Tenth Amendment of the Constitution, respectively. Count VII asserts that the actions of the federal government in this case are violating the Due Process Clause of the Fifth Amendment. Finally, Count VIII is a prayer for injunctive relief to forestall the application of the statutory penalties that are discussed above until this case can be decided on the merits.

6. In particular, the Court questioned whether it lacked subject matter jurisdiction due to the absence of a cognizable federal claim, a justiciable controversy or a waiver of the sovereign immunity of the United States. *See generally* Richard H. Fallon, Daniel J. Meltzer & David L. Shapiro, *Hart & Wechsler's the Federal Courts and the Federal System* 375 (4th ed.1996); Henry M. Hart, Jr., *The Power of Congress to Limit the Jurisdiction of the Federal Courts: An Exercise in Dialectic*, 66 Harv. L.Rev. 1362, 1366–71 (1953) (discussing tension between constitutional rights and doctrine of sovereign immunity and observing that "[t]he multiplicity of remedies, and the fact that Congress has seldom if ever tried to take them all away, has presented the issue from ever being squarely presented."). It is well settled that the federal courts have a continuing duty to independently evaluate their jurisdiction in the cases that are before them. *See generally Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 68, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) ("[W]e must address the question of whether

sons that are set forth below, the Court concludes that this lawsuit is properly subject to adjudication, but the Constitution and federal laws do not support the State's request for relief. Thus, Secretary Shalala is entitled to the disposition that she seeks in this litigation.

## III

■ The State has invoked the federal question jurisdiction of the Court. *See* 28 U.S.C. § 1331. In *Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* the Supreme Court stated that

[f]or purposes of determining whether jurisdiction exists under § 1331(a) to resolve [these] claims, it is not necessary to decide whether [the] alleged cause of action against the [agency] based directly on the Constitution is in fact a cause of action "on which [the claimants] could actually recover." Instead, the test is whether " 'the cause of action alleged is so patently without merit as to justify ... the court's dismissal for want of jurisdiction.' " * * * The further question of whether [a] cause of action under the Constitution is one generally to be recognized need not be decided here. The question does not directly implicate our jurisdiction ....

438 U.S. 59, 70–71, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (quoting *Bell v. Hood,* 327 U.S. 678, 682, 683, 66 S.Ct. 773, 90 L.Ed. 939 (1946), and *Hagans v. Lavine,* 415 U.S. 528, 542–43, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974)); *see also Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 89,

118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (Federal courts may only dismiss case "for lack of subject-matter jurisdiction because of the inadequacy of the federal claim ... when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of th[e Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy.' ") (quoting *Oneida Indian Nation of N.Y. v. County of Oneida,* 414 U.S. 661, 666, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974); citing *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 359, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959)).[7] In establishing this jurisdictional standard, the *Duke Power* Court considered its decisions in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and *Hagans,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577, wherein it permitted the direct examination of the constitutionality of federal action, "as well as the general admonition that 'where federally protected rights have been invaded ... courts will be alert to adjust their remedies so as to grant the necessary relief.' " *Duke Power,* 438 U.S. at 71, 98 S.Ct. 2620 (quoting *Bell,* 327 U.S. at 684, 66 S.Ct. 773); *see also* 16 Am Jur.2d *Constitutional Law* § 109 (1998) ("There is a strong presumption that constitutional claims are judicially reviewable in some forum."). Since *Duke Power,* the Supreme Court has continued to allow constitutional challenges to federal legislation. *See, e.g., New York v. United States,* 505 U.S. 144, 112 S.Ct.

the District Court had subject-matter jurisdiction ... despite the fact that none of the parties raised the issue and the District Court did not consider it."); *Clark v. Paul Gray, Inc.,* 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001 (1939) (Court had duty to raise question as to jurisdiction when it appeared doubtful during argument that matter in controversy exceeded requisite statutory amount). Through a letter on September 18, 2000, the Court instructed the parties to provide supplemental briefs in an attempt to identify what, if any, federal claim permits a finding of jurisdiction and whether the State, or any other Plaintiff, has standing to present the claim.

7. Here, just as in *Duke Power,* "[i]mplicit in the complaint is also the assumption that there exists a cause of action directly under the Constitution to vindicate [the claimants'] federal rights through a suit against the [federal officer and] the executive agency charged with enforcement and administration of the allegedly unconstitutional statute." 438 U.S. at 69, 98 S.Ct. 2620. While it is unclear whether this assumption is correct, this issue need not be addressed and resolved in order for the Court to be satisfied of its jurisdiction.

2408, 120 L.Ed.2d 120 (1992); *South Dakota v. Dole*, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987).

■ These authorities counsel that a sufficient foundation for the exercise of federal question jurisdiction is established in a declaratory judgment action whenever a claimant challenges the constitutionality of the text or the manner of implementation of a federal statute. Here, the State contends that Congress overstepped the boundaries of the Spending Clause and the Tenth Amendment when it statutorily attached certain conditions to the receipt of federal funding. In the judgment of the Court, these allegations are sufficient to create federal question jurisdiction, and, hence, it need not address whether, in fact, a federal cause of action exists.

## IV

■ Although federal questions often fall within the purview of the federal courts, the Constitution requires that each such issue be presented as a part of an actual case or controversy. U.S. Const. art. III, § 2. One component of this general requirement is that a claimant must have standing in order to assert its claims. *See Clinton v. City of New York*, 524 U.S. 417, 429, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998); *Steel Co.*, 523 U.S. at 92, 118 S.Ct. 1003; *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).[8] As a general matter, it has been observed that "the states have no general standing before the United States Supreme Court to attack laws passed by Congress." 16 Am. Jur.2d *Constitutional Law* § 151 (1998).

■ Here, the Court has asked the parties to identify the circumstances that would justify a finding of standing. The standing inquiry involves two basic questions about the character of the lawsuit and the litigants. First, the Court must determine whether the litigation more closely resembles a traditional lawsuit rather than a historically legislative or executive activity. *See generally Federal Election Comm'n v. Akins*, 524 U.S. 11, 23, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) (generalized grievances are better suited to legislative, not judicial, processes).[9] Second, the Court must also "focus[ ] on whether the plaintiff is the proper party to bring this suit, although that inquiry 'often turns on the nature and source of the claim asserted.'" *Raines v. Byrd*, 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (quoting *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)); *see* Richard H. Fallon, Jr., Daniel J. Meltzer & David L. Shapiro, *Hart & Wechsler's The Federal Courts and the Federal System* 136 (4th ed.1996).

■ To facilitate this examination, the Supreme Court has stated that standing exists when a claimant "allege[s] personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen*, 468 U.S. at 751, 104 S.Ct. 3315, *quoted in Department of Commerce v. United States House of Representatives*, 525 U.S. 316, 329, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999). Thus, a claimant must make a showing which addresses the elements of injury, causation, and redressability. Nonetheless, the Court is obliged to interpret these elements in accordance with the basic

---

**8.** "[T]he doctrine ... serves to identify those disputes which are appropriately resolved through the judicial process." *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990), *cited in Steel Co.*, 523 U.S. at 102, 118 S.Ct. 1003 ("Standing to sue is part of the common understanding of what it takes to make a justiciable case."); *see Steel Co.*, 523 U.S. at 92, 118 S.Ct. 1003 (the Court has "always taken [Article III] to mean cases and controversies of the sort traditionally

amenable to and resolved by the judicial process").

**9.** In this respect, the standing doctrine preserves a fundamental principle of American government—the separation of powers. *See Steel Co.*, 523 U.S. at 102, 118 S.Ct. 1003 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

questions that they were meant to answer in order for the doctrine to fulfill its underlying constitutional purpose.

In response to the prompting by the Court, the Secretary has contended that the Plaintiffs (1) are not the proper parties to bring these claims against her and (2) have submitted a generalized grievance that is ill-suited to the judicial process. Nonetheless and with respect to the State, a review of the current record in this case reveals that the alleged harms (to wit, the pecuniary penalties) are directly traceable to the arguably unconstitutional acts of Congress. *See State of Kansas v. United States,* 24 F.Supp.2d 1192, 1195 (D.Kan. 1998). Moreover, the Court is statutorily empowered to grant at least some of the declaratory relief that is sought by the State. *See* 28 U.S.C. § 2201. Hence, the determinative issue of standing is whether the State has alleged a sufficient injury.

■ A cognizable injury is present when a claimant points to "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In this case, the State's allegations, if accepted as true, reveal that it has incurred, and is continuing to incur, an actual and an imminent infringement of its legal rights under the Tenth Amendment and federal law. First, if Congress' enactment of the legislation at issue has exceeded its constitutional powers, as alleged in the Complaint, then the State's reserved rights under the Tenth Amendment have already been violated. Such an injury, if any, occurred on the date upon which the

statute was enacted. Moreover, the State has identified a claimed financial harm (i.e., the probable loss of millions of dollars in federal funding during the next session of Congress if its arguments do not prevail here) that is sufficiently imminent to sharpen its interest in the litigation. Accordingly, the Court concludes that the State is a proper party to bring these claims.

■ Nonetheless, as to the State's claim arising under the Due Process Clause of the Fifth Amendment, it is well settled that "[t]he word 'person' in the context of [that] Clause … cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union …." *South Carolina v. Katzenbach,* 383 U.S. 301, 323, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). Thus, as it applies to this controversy and as the State admitted during its oral argument, the State cannot invoke the protections of the Fifth Amendment with claims that it has been harmed. Therefore, the Court concludes that (1) the State has failed to set forth an injury under the Fifth Amendment upon which a finding of standing could be based, (2) this Court lacks jurisdiction to hear the claim,[10] and (3) Count VII must be dismissed.

■ With respect to the remaining claims, the Secretary maintains that this lawsuit is an improper attempt upon which to obtain judicial review of a generalized grievance. She posits that a substantial section of South Carolinian society would feel the economic effects which would result from a reduction in federal funding. Thus, Secretary Shalala submits that the State's interest is not concentrated enough to serve as the basis for adjudication. In

---

10. Following its initial review, the Court has been unable to identify any other Plaintiff who would have standing to assert the Due Process claim. The officers of the State, who are representing their respective branches of government, do not appear to be asserting the rights of any "person" who is protected by the Due Process Clause. Neither the State nor its officers have the authority to represent South Carolinian citizens against the United States. *See Commonwealth of Massachusetts v. Mellon,* 262 U.S. 447, 483–84, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). Moreover, any claim by the State's citizens upon the allegations here would ostensibly be shared by a substantial section of South Carolinian society. Such claims amount to the kind of generalized grievance that is better suited to the legislative process.

support, she looks to *Wyoming v. Oklahoma,* 502 U.S. 437, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992), for the proposition that general economic injuries to a state are too diffuse to create standing for the purpose of this lawsuit.

However, the Secretary has overstated the reach of *Wyoming.* In her favor, she correctly cites the Supreme Court as having recognized that standing has been denied "to States where the claim was that actions taken by United States Government agencies had injured a State's economy and thereby caused a decline in general tax revenues." *Id.* at 448, 112 S.Ct. 789 (citations omitted). At the same time, the *Wyoming* Court expressly distinguished such claims from actions that "involve[ ] a direct injury in the form of a loss of specific tax revenues—an undisputed fact here." *Id.* at 448, 112 S.Ct. 789. On this basis, the Supreme Court found that standing exists whenever an economic injury to a state is direct and specific. *See id.*

In the present case, the State does not merely assert that the disputed federal actions will have a vague effect upon its economy. Instead, it complains that the United States will deprive it of particular monies and impose specific penalties. As such, the State's grievance is not abstract, but rather it is particularized. Hence, the Court determines that (1) this controversy is fit for adjudication, and (2) the State has standing to litigate the current issues in controversy. Moreover, because the State is competent to argue each of these pending questions, it is unnecessary at this time to examine in detail whether the remaining Plaintiffs have equal standing to bring these claims.

## V

■■■■ Despite the existence of a federal question and the State's standing to sue, Secretary Shalala contends that the doctrine of sovereign immunity undermines the jurisdiction of the Court to address and resolve the contested issues. In general, "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer,* 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994), *quoted in Department of the Army v. Blue Fox, Inc.,* 525 U.S. 255, 260, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999); *see Block v. North Dakota,* 461 U.S. 273, 280, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983) (doctrine bars suits by states and individuals). However, this principle does not apply when a claimant alleges that "the statute or order conferring power upon the [federal] officer to take action in the sovereign's name is ... unconstitutional." *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 690, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). Hence, the federal courts are not prevented from adjudicating claims that the United States or its officers have exceeded constitutional limitations. Here, the State claims that sections 652 through 655 of *Title IV–D* infringe upon its rights under the Spending Clause, as well as the Fifth and Tenth Amendments. It is well settled that these claims are within the jurisdiction of the Court.

■■■■ As to the State's statutory claims, Congress has expressly waived federal immunity. At least one member of the Supreme Court has observed that "5 U.S.C. § 702 ... waives the immunity of the United States in actions for relief other than money damages." *Reno v. American–Arab Anti–Discrimination Comm.,* 525 U.S. 471, 510, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (Souter, J., dissenting). The waiver is not limited to those suits that are brought under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, 704. *Id.* ("This waiver of immunity is not restricted by the requirement of final agency action that applies to suits under the Administrative Procedure Act."). The majority of federal appellate courts that have considered this issue have reached the same conclusion. *See United States v. Vazquez,* 145 F.3d 74 (2d Cir.1998) (§ 702 waives immunity for declaratory and injunctive claims); *A.E. Finley & Assocs. v.*

*United States,* 898 F.2d 1165, 1167 (6th Cir.1990) (general waiver under § 702 applies to all actions for nonmonetary relief under 28 U.S.C. § 1331); *Presbyterian Church (U.S.A.) v. United States,* 870 F.2d 518, 525 (9th Cir.1989) ("On its face, the 1976 amendment is an unqualified waiver of sovereign immunity in actions seeking nonmonetary relief against legal wrongs for which governmental agencies are accountable."); *Jaffee v. United States,* 592 F.2d 712, 718–19 (3d Cir.1979). Here, the State has requested declaratory and injunctive relief in an effort to determine the statutory power of an agency to grant the ultimate relief that it seeks. Such claims are not barred by the doctrine of sovereign immunity. Accordingly, this Court determines that it has jurisdiction to evaluate the issues in this controversy.

## VI

Having resolved these important preliminary questions, the Court now turns its attention to the issues that have been raised in the parties' motions. Secretary Shalala initially has submitted a request for dismissal on two grounds. First, she attacks the jurisdiction of the Court by arguing that the State has failed to exhaust its administrative remedies. She also maintains that the State cannot obtain the injunctive and declaratory relief that its seeks because its claims lack substantive merit. Specifically, she contends that *Title IV–D* (1) is constitutionally permissible and (2) mandates the conditions that the State now challenges in this action. Importantly, Secretary Shalala insists that she does not have any discretion to waive them.

**11.** *See Meliezer v. RTC,* 952 F.2d 879, 881 (5th Cir.1992). When presented with the same type of motion, other courts have concluded that "[a]ny factual findings by the district court in resolving a motion to dismiss are [subject to] review[ ] only for clear error." *Jones v. City of Lakeland,* 175 F.3d 410, 413 (6th Cir.1999) (citing *Gafford v. General Elec. Co.,* 997 F.2d 150, 161 (6th Cir.1993)).

## A

Federal Rule of Civil Procedure 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction. According to the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit"), "[w]hen a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), 'the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *Evans v. B.F. Perkins Co.,* 166 F.3d 642, 647 (4th Cir.1999) (quoting *Richmond, Fredericksburg & Potomac R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir.1991)).[11]

The motion should be granted only "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond,* 945 F.2d at 768, *quoted in Evans,* 166 F.3d at 647. Throughout its assessment of the motion, the Court is mindful that the plaintiff bears the burden of proving the existence of jurisdiction. *See Evans,* 166 F.3d at 647; *Richmond,* 945 F.2d at 768.

## B

According to the Secretary, the Court lacks subject matter jurisdiction because the State has failed to exhaust its administrative remedies.[12] (Defs.' Mem. Supp. Mot. Dismiss at 8.) In support, Secretary Shalala argues that there has been no final action by her Department for the Court to review and no exception to the exhaustion doctrine is applicable to the issues herein.[13]

**12.** The Secretary relies upon *Drew v. United States,* 217 F.3d 193 (4th Cir.2000) (concerning administrative claim filed with Air Force, as required by 28 U.S.C. § 2675(a)). However, *Drew* was vacated on September 8, 2000 by the Fourth Circuit, which granted a rehearing *en banc.* A superceding opinion has not been issued.

**13.** The law is clear that although the doctrines of exhaustion and finality are related,

**868**

In its responsive pleadings, the State asserts, among other things, that the anticipated actions by the Secretary place it on the horns of an untenable dilemma. The State claims that if its remedies are exhausted and it elects to await a pending administrative decision, it may become ineligible to choose an alternative lesser statutory penalty for its non-compliance. As such, the State stands to lose hundreds of millions of dollars in funding to poor families over the course of the coming years. On the other hand, if it accepts the alternative penalty, its poor residents will lose tens of millions of. dollars in financial assistance.

■ Before the Court can consider the Secretary's arguments as to the questions of finality and doctrinal exceptions, it must first find an exhaustion requirement. Such a requirement can arise by statute or through an operation of the common law. *See* 2 Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 15.3, at 316 (3d ed.1994) (citing *McCarthy v. Madigan,* 503 U.S. 140, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992)). When Congress statutorily commands claimants to pursue administrative remedies before seeking judicial review, the exhaustion requirement is mandatory.[14] *See McCarthy,*

503 U.S. at 144, 112 S.Ct. 1081. For example, a party who seeks relief pursuant to the APA must first submit the claim to the prescribed administrative tribunal. At the same time, "the exhaustion doctrine continues to apply as a matter of judicial discretion in cases not governed by the APA." *Darby v. Cisneros,* 509 U.S. 137, 154, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993).

■ The Complaint in this case contains eight counts. The bulk of the State's claims (to wit, Counts I and III through VIII) pertain to the constitutional and legislative legitimacy of the Secretary's administrative procedures. They do not sound in the APA. Indeed, the State has distinguished these counts from those that arise under the APA. (*See* Pls.' Mem. in Resp. to "Supplemental Br. of the United States" at 2–3.) Neither the Complaint nor the parties' briefs on the instant motion set forth any other statutory authority that might mandate an exhaustion requirement for these claims.[15] Instead, Secretary Shalala has acknowledged that "[a]lthough an opportunity for an evidentiary hearing is routinely provided in State Plan conformity disputes, there is no statutory requirement and the Departmental Appeals Board has held that there is no

they are different. *See McCarthy v. Madigan,* 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992).

**14.** *See also City of Detroit Pension Fund v. Prudential Sec. Inc.,* 91 F.3d 26, 29 (6th Cir. 1996) (when Congress "vests in an administrative agency exclusive jurisdiction over any [particular] claims ... failure to exhaust administrative remedies generally bars judicial review") (discussing *Pennsylvania R.R. Co. v. Day,* 360 U.S. 548, 79 S.Ct. 1322, 3 L.Ed.2d 1422 (1959)); *Rosa v. RTC,* 938 F.2d 383, 395 (3d Cir.1991) ("Congress made this statutory exhaustion requirement [under the FIRREA] explicitly jurisdictional."); *Townsend v. United States Dept. of Justice (INS),* 799 F.2d 179, 181 (5th Cir.1986) ("When exhaustion is statutorily mandated, the requirement is jurisdictional."), *quoted in Meliezer,* 952 F.2d at 882.

**15.** Secretary Shalala has argued that "because Congress has specifically vested the

duty of implementing the regulations and laws at issue to [her agency], Congress has spoken clearly in requiring exhaustion of administrative remedies." (Defs.' Mem. Supp. Mot. Dismiss at 11) (citing *Volvo GM Heavy Truck Corp. v. United States Dep't of Labor,* 118 F.3d 205, 211 (4th Cir.1997).) However, if the Court adopted the Secretary's expansive reading of *Volvo GM* and declared that the mere act of granting authority to an executive officer with which to implement a statute constitutes sufficient grounds to render exhaustion mandatory, it would ostensibly contradict much Supreme Court precedent. *Compare, e.g., Darby,* 509 U.S. at 154, 113 S.Ct. 2539 (discussing claims against federal housing agency that are not subject to mandatory exhaustion), *with* 42 U.S.C. §§ 3531 *et seq.* (1993) (granting authority to Secretary of Housing and Urban Development to implement executive policies and legislation).

necessity for an evidentiary hearing whe[re as here,] there are no genuine issues of material fact." (Defs.' Mot. Dismiss at 4 n. 5 (citations omitted).) Accordingly, the question as to whether the State should be required to exhaust the available administrative procedures for these claims falls within the sound discretion of this Court.

■ In considering whether to impose a discretionary exhaustion requirement, "federal courts must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." *McCarthy*, 503 U.S. at 146, 112 S.Ct. 1081. Importantly, the Supreme Court has recognized that the "[a]pplication of this balancing principle is 'intensely practical,' because attention is directed to both the nature of the claim presented and the characteristics of the particular administrative procedure provided." *Id.* (quoting *Bowen v. City of New York,* 476 U.S. 467, 484, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986); citing *Mathews v. Eldridge,* 424 U.S. 319, 331, n. 11, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). Nonetheless, it has been observed that "[e]xhaustion is usually required unless considerations of individual justice, efficiency, or wise judicial administration support the need for judicial review in the absence of exhaustion." 2 Davis & Pierce, *supra* § 15.2, at 307; *see Reiter v. Cooper,* 507 U.S. 258, 269, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993); *McCarthy,* 503 U.S. at 144, 112 S.Ct. 1081 (citing *Myers v. Bethlehem Shipbldg. Corp.,* 303 U.S. 41, 50–51, and n. 9, 58 S.Ct. 459, 82 L.Ed. 638 (1938)); *see generally Sims v. Apfel,* 530 U.S. 103, 120 S.Ct. 2080, 2083, 147 L.Ed.2d 80 (2000) (failure to seek any redress from Social Security Appeals Council precludes judicial review of claim for benefits).

■ In order to assess the gravity of the federal interest in requiring exhaustion, the Court must initially examine Congress' legislative intent in enacting the statute. *See Darby,* 509 U.S. at 144–45,

113 S.Ct. 2539 ("Whether courts are free to impose an exhaustion requirement as a matter of judicial discretion depends, at least in part, on whether Congress has provided otherwise, for of paramount importance to any exhaustion inquiry is congressional intent.") (quoting *McCarthy,* 503 U.S. at 144, 112 S.Ct. 1081; *Patsy v. Board of Regents of Florida,* 457 U.S. 496, 501, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982)) (internal quotation and alteration marks omitted); *Nationsbank Corp. v. Herman,* 174 F.3d 424 (4th Cir.1999) ("Where Congress has intended to require administrative exhaustion prior to any judicial challenges to an agency's enforcement of a law or regulation, courts enforce that requirement unless a party provides grounds for waiving it in a particular case."). Then, the Court must consider the facts of the case in light of, among other things, the requirement's "twin purposes of protecting administrative agency authority and promoting judicial efficiency." *McCarthy,* 503 U.S. at 145, 112 S.Ct. 1081.

Against these federal interests, the Court must also weigh the needs of a plaintiff to have immediate judicial review. The *McCarthy* Court "recognized at least three broad sets of circumstances [that] weigh heavily against requiring administrative exhaustion." 503 U.S. at 146, 112 S.Ct. 1081. First, exhaustion may be inappropriate if it would cause "undue prejudice to [a party's] subsequent assertion of a court action." *Id.* at 146–47, 112 S.Ct. 1081 (discussing prejudice that could result from, among other things, lengthy delay in receipt of final administrative decision or otherwise irreparable harm). "Second, an administrative remedy may be inadequate 'because of some doubt as to whether the agency was empowered to grant effective relief.'" *Id.* at 147, 112 S.Ct. 1081. The Court expressly noted that such limitations on administrative competency may arise when the constitutionality of a statute is challenged. *Id.* at 147–48, 112 S.Ct. 1081. Finally, the inadequacy of an administrative remedy may be apparent when "the

administrative body is shown to be biased or has otherwise predetermined the issue before it." *Id.* at 148, 112 S.Ct. 1081 (citing *Gibson v. Berryhill,* 411 U.S. 564, 575 n. 14, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); *Houghton v. Shafer,* 392 U.S. 639, 640, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968)).

Applying these considerations to the present circumstances, the Court concludes that an administrative exhaustion effort by the Plaintiffs is not required. On one side of the scale, there appear to be three reasons why the federal interest does not weigh strongly in favor of allowing Secretary Shalala to initially decide the specific constitutional and statutory issues that are to be presented to the federal judiciary. First, after reviewing the legislative history which surrounds the Child Support Enforcement Act and its amendments, the Court is unable find any indication that it was the intention of Congress for claims, such as those that have been advanced by South Carolina, to be first heard by the Department of Health and Human Services. Second, in permitting judicial review, the Court is not impinging upon the established authority of the agency. Although Secretary Shalala has fashioned a method of reviewing the states' concerns with respect to their compliance with federal law, this process is not authoritatively recognized as being the states' exclusive forum for relief. Third, any general gain in efficiency that might result from the administrative process is offset here by the judicial waste that would follow a dismissal of this case by the Department.

On the other side of the scale, there are a similar number of reasons why the interest of the State and its citizens in having an immediate judicial review is substantial. First, although a dismissal at the administrative level would not result in an unwarranted delay in the judicial process, it would have a prejudicial effect. In a subsequent legal proceeding, the State ostensibly would be operating at a significant disadvantage, in that it would (1) have incurred penalties in the meantime and (2) be ineligible to elect a lesser alternative penalty if its claims were ultimately rejected. Second, the State has challenged the constitutionality of the agency's governing statute, as well as its apparent interpretation of the range of relief that is available upon administrative review. Such questions concern the nature and validity of the administrative structure itself, and not merely the correctness of its application. These issues fall less within the competency of the administrative agency and more within the purview of the federal courts. Third, the presiding officer, who was assigned by the Secretary to submit proposed findings relating to the State's compliance with the federal statutes at issue, concluded that (1) an automated data processing system is mandatory, (2) Secretary Shalala does not have any discretion to conditionally certify the State's present system or to impose any lesser sanction for the State's failure to have an operable system, and (3) the State is out of compliance with its federally mandated requirements. (Defs.' Mem. Supp. Mot. Dismiss at 5.) Although the ultimate decision is not entirely predetermined by the presiding officer's proposed disposition of this matter, such a preliminary report implies that Secretary Shalala is more likely to reach a conclusion that is adverse to the State. Notably, the circumstances that led to this dispute arose when the Secretary "began the formal process to disapprove the State's title IV–D Plan ...." (*Id.* at 3.) This procedural posture suggests that an administrative decision against the State is somewhat of a foregone conclusion. Each of these factors weighs in favor of permitting this case to proceed without requiring administrative exhaustion. Accordingly, the Court determines that an administrative exhaustion is not required as it pertains to the State's Counts I and III through VIII.

██ However, a different conclusion is warranted as to the State's second claim, which has been captioned as a request for

redress for Secretary Shalala's "Failure to Conform with Procedures." In this count, the State asks the Court to compel the Secretary to heed her Department's official practice and grant the State a full evidentiary hearing as to whether, in light of all the circumstances that surround this case, the statutory requirements should be waived. Having carefully reviewed the Complaint, the Court finds no basis upon which to distinguish this count from a standard claim under the APA. Thus, the Court concludes that an administrative exhaustion requirement is applicable to the State's second request for relief.

Nevertheless, the question remains as to whether the State's failure to satisfy this requirement should result in a dismissal of its second claim. Both parties have correctly observed that the federal courts allow an exemption from an exhaustion requirement where the claimant can show, among other things, that a resort to administrative review would be futile. (Defs.' Mem. Supp. Mot. Dismiss at 11; Pls.' Mem. Opp'n to Mot. Dismiss at 13.) *See McDonald v. Centra,* 946 F.2d 1059, 1063 (4th Cir.1991). According to the Fourth Circuit, a party's mere assertion that its administrative claims will fail is an insufficient basis upon which to demonstrate the requisite futility "[a]bsent a hard and fast position [by the federal agency or official] that makes an adverse ruling a certainty . . . ." *Thetford Properties IV Ltd. v. Department of H.U.D.,* 907 F.2d 445 (4th Cir.1990), *quoted in Volvo GM Heavy Truck Corp. v. United States Dep't of Labor,* 118 F.3d 205, 214 (4th Cir.1997).

Here, the Secretary has consistently maintained that, under the federal statutes and regulations, she lacks the statutory authority to hold the kind of hearing that the State seeks. (*See, e.g.,* Defs.' Reply for Mot. Dismiss at 9–10 (asserting that (1) questions about reasons for the State's noncompliance are irrelevant to evidentiary hearings that Secretary Shalala conducts in her administrative procedures, (2)

this hearing would be useless since she cannot grant requested relief unless Court finds that she has the discretion to waive statutory conditions, and (3) she lacks jurisdiction over other necessary parties).) Moreover, her general position (namely, that the State's requests are without merit) as discussed in reference to the other claims, is sufficient to reassure this Court that a resort by the State to the administrative process would be futile. Accordingly, the Court concludes that jurisdiction is present as to Count II of the Complaint under the circumstances in this case despite the State's failure to exhaust its administrative remedies.

C

According to Shalala, even if jurisdiction is present, she is entitled to a dismissal or an entry of a summary judgment as to the State's claims because they lack substantive merit. Although motions to dismiss for failure to state a tenable claim are governed by Federal Rule of Civil Procedure 12(b)(6), the Rule provides that such applications for dispositive relief are converted to ones for summary judgment where, as here, the Court considers evidence outside the pleadings. In such cases, Federal Rule of Civil Procedure 56 sets forth the applicable standards.

Under Rule 56(c), the Court renders a judgment forthwith only if the pleadings and evidentiary submissions, "if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In assessing the request, the Court examines any pleadings and evidence in the light that is most favorable to the nonmoving party. *See* Fed.R.Civ.P. 56(c); *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (quoting *Anderson,* 477 U.S. at

255, 106 S.Ct. 2505). Nonetheless, the Court is mindful that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Importantly, the Court may deny summary judgment on one claim even while granting partial summary judgment on another claim. *See* Fed.R.Civ.P. 56(d) ("If . . . judgment is not rendered . . . for all the relief asked . . . the court at the hearing on the motion . . . shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order [specifying and distinguishing the facts that are and are not controverted]."). Thus, each claim must be analyzed separately under these standards.

### D

Secretary Shalala asks the Court to enter a summary judgment against some of the State's constitutional claims. Specifically, she contends that Congress acted well within its authority under the Spending Clause when it enacted the conditions under *Title IV–D*. Thus, it is her position that the State's requests for relief under Article I and the Tenth Amendment must fail. In its response, the State maintains that Congress did not heed the requirements of the Spending Clause because (1) the operation of *Title IV–D* does not enhance the general welfare, (2) the statutory text does not notify the states of the full effect of their acceptance of federal funding, (3) *Title IV–D* is not rationally related to Congress' goal of enhancing child support enforcement, and (4) the federal government has effectively engaged in impermissible coercion in requiring the states to satisfy the conditions of the statute.

The seminal case on the breadth of Congress' authority under the Spending Clause is *South Dakota v. Dole*, 483 U.S.

203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987). There, the legislature had approved federal spending provisions for the construction and maintenance of the national highways. However, this legislation required, among other things, the Secretary of Transportation to withhold a portion of the allocated funds from any state that did not prohibit the purchase or public possession of alcohol to anyone who was younger than twenty-one years of age. *See* 23 U.S.C. § 158 (1982 ed., Supp. III). The effect of the law was generally to institute a national minimum drinking age. South Dakota argued that such legislation usurped its constitutional powers under the Twenty-first and Tenth Amendments. *South Dakota*, 483 U.S. at 205–06, 107 S.Ct. 2793.

The Supreme Court concluded that, regardless of whether Congress could directly regulate the drinking age, the statute was well within the legislature's authority to "provide for the . . . general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1, *quoted in* 483 U.S. at 206, 107 S.Ct. 2793. In reaching this conclusion, the *South Dakota* Court observed that, as an incident to the spending power, Congress properly may attach a broad range of conditions to the receipt of federal monies in an effort to further its policy objectives. 483 U.S. at 206, 107 S.Ct. 2793 (citing *Fullilove v. Klutznick*, 448 U.S. 448, 474, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980); *Lau v. Nichols*, 414 U.S. 563, 569, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); *Ivanhoe Irrigation Dist. v. McCracken*, 357 U.S. 275, 295, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958); *Oklahoma v. Civil Service Comm'n*, 330 U.S. 127, 143–44, 67 S.Ct. 544, 91 L.Ed. 794 (1947); Chas C. *Steward Machine Co. v. Davis*, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937)). Such conditions need not relate closely to the enumerated powers of Congress. *South Dakota*, 483 U.S. at 207, 107 S.Ct. 2793 (citing *United States v. Butler*, 297 U.S. 1, 66, 56 S.Ct. 312, 80 L.Ed. 477 (1936)).

At the same time, the *South Dakota* Court acknowledged that Congress' spend-

ing power is not without limits. *Id.* at 207, 107 S.Ct. 2793. As a preliminary concern, "the exercise of the spending power must be in pursuit of 'the general welfare.'" *Id.* (citing *Helvering v. Davis,* 301 U.S. 619, 640–41, 57 S.Ct. 904, 81 L.Ed. 1307 (1937); *Butler,* 297 U.S. at 65, 56 S.Ct. 312). In the present case, the State argues that the conditions of *Title IV–D* are not consistent with the nation's welfare. Specifically, it contends that, as applied, "the statute penalizes effective child support mechanisms used by the State and takes away TANF funding from needy families." (Pls.' Mem. Opp'n Mot. Dismiss at 23.) As such, the State asserts that the conditions attached to *Title IV–D* are unconstitutional.

When considering whether a spending provision is in the interest of the general welfare, the Court "should defer substantially to the judgment of Congress." *South Dakota,* 483 U.S. at 207, 107 S.Ct. 2793. Here, Congress made a considered judgment that the American public would benefit significantly from the enhanced enforcement of child-support decrees and the diminution of the number of parents who are able to avoid their obligations simply by moving across local or state lines. The mere fact that this Congressional policy may result in some hardship to certain citizens is not sufficient to undermine the assessment by Congress that the measure enhances the "general welfare." The State presents no argument that the *Title IV–D* conditions, as applied nationally, are causing hardships to the general citizenry. Moreover, to the extent that South Carolina's residents experience the effects of the disputed policy, it is unclear why Congress should be found to be the primary cause of the loss.[16] After all, the State allocates its own tax base in addressing the needs of impoverished families, and it bears the burden of creating centralized child-support data and disbursement units. In the end, the decision lies with the State as to what public benefits to provide, whether to create these centralized systems, and whether to accept or refuse federal funding.[17] *See Nevada v. Skinner,* 884 F.2d 445, 448 (9th Cir.1989). Viewing these factors collectively, the Court is satisfied that Congress acted in the general welfare when it enacted the *Title IV–D* conditions.

As a second limitation on Congress' power to spend federal funds, the *South Dakota* Court observed that statutory or regulatory conditions must be unambiguous so that states can "exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* (quoting *Pennhurst State School and Hosp. v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)). Here, the State protests that it did not have notice of the effect of its acceptance of TANF funds because "[t]he State could not have known that circumstances completely outside of its control would result in the termination of federal funding." (Pls.' Mem. Opp'n Mot. Dismiss at 23.) For this reason, it

16. Secretary Shalala has vigorously challenged the factual accuracy of the State's assertion that its present system is sufficiently effective in ensuring that families obtain the support to which they are entitled. (*See* Defs.' Reply Mot. Dismiss at 4–7.) Hence, a question lingers as to why the enforcement of the *Title IV–D* conditions against the State will not ultimately result in a gain for the welfare of its citizens. Nonetheless, the Court need not resolve that particular factual dispute in order to address the merit of the State's legal argument.

17. This reveals a more fundamental flaw in the State's argument. The State does not

contend that Congress has improperly spent federal funds. Rather, it asks the Court to conclude that Congress has improperly refused to spend federal funds and, implicitly, that it has some affirmative obligation to ensure the general welfare. This position is untenable. "Congress has no obligation to use its Spending Clause power to disburse funds to the States, such funds are gifts." *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 686–87, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999), *quoted in Litman v. George Mason Univ.,* 186 F.3d 544, 552 (4th Cir.1999).

asks the Court to declare the challenged conditions to be unconstitutional.

Although the Court accepts the State's representation that it did not anticipate all of the reasons that could cause this outcome, this fact does not render the statute ambiguous. The federal laws state clearly and unequivocally that, as a condition of the State's participation in the TANF Program, it must establish and operate the child-support enforcement systems at issue. *See* 42 U.S.C. §§ 654–55 (1998). On the basis of the record in this case, the State has not denied that it was aware that a failure to meet the requirements of *Title IV–D* would cause a withdrawal of funding. Indeed, the State's knowledge of the nature and gravity of the *Title IV–D* conditions is evidenced by its long and close cooperation with the United States in an effort to meet its obligations. The Court observes that, in all likelihood, neither the State nor Congress anticipated that the company which contracted with the State to create these enforcement systems would ostensibly default on its obligations. What is clear, however, is that both of the parties recognized that the State accepted the responsibility for creating these systems as a condition precedent to its receipt of federal monies. Accordingly, the State's contention that the conditions were so ambiguous as to constitute a misuse of the spending power must be rejected.

■■■ The State also argues that the *Title IV–D* conditions are not rationally related to Congress' stated purpose in their enactment. *See New York v. United States,* 505 U.S. 144, 167, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) ("conditions must ... bear some relationship to the purpose of the federal spending") (citing *South Dakota,* 483 U.S. at 207–08, 107 S.Ct. 2793). "Instead of taking away the State's computer development funding, [the Secretary] is going down the path of taking away all child support enforcement funds and TANF funds." (Pls.' Mem. Opp'n Mot. Dismiss at 23.) However, the State has presented an incomplete account of the intent of Congress, and its contention does not withstand review.

Although the specific rationale behind *Title IV–D* concerns the enforcement of child-support obligations, *see* 42 U.S.C. § 651 (1999), the challenged conditions were enacted as part of Congress overriding project to streamline federal public assistance programs. As a small part of that project, the legislature sought, among other things, to establish a mechanism whereby impoverished families would be able to collect any overdue child-support payments. Thus, the specific conditions attached in *Title IV–D* were also aimed to achieve the broader goals of the more sweeping reforms; namely, to "provide assistance to needy families so that children may be cared for in their own homes [and] end the dependence of needy parents on government benefits ...." 42 U.S.C. § 601(a) (Supp. II 1996).

In the area of child support, these goals had long been thwarted by localized enforcement systems that were unable to quickly and effectively track delinquent parents who crossed county and state lines. Congress took action to remedy this ill. *See generally* 132 Cong. Rec. S5303–04 (1986) (statement of Sen. Bradley). In this context, the Court cannot say that Congress acted irrationally when, in its efforts to reduce the incidence of poverty among children and families, it conditioned a state's receipt of TANF funds upon its commitment to create the centralized data and distribution systems at issue. Thus, the contention that the conditions at issue are not rationally related to legitimate governmental objectives must be rejected. Notably, this conclusion compels the entry of a summary judgment against the State as to its Count III. *See supra* note 5.

■■■ The State's most compelling argument concerns the coercive effect of the *Title IV–D* legislation. In *South Dakota,* the Supreme Court recognized that in extreme cases the Tenth Amendment might limit Congress' use of the spending power.

In considering whether the highway funding provision infringed upon South Dakota's rights under the Tenth Amendment, the *South Dakota* Court noted that "in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns to compulsion.'" 483 U.S. at 210–11, 107 S.Ct. 2793 (quoting *Chas C. Steward Machine Co.*, 301 U.S. at 590, 57 S.Ct. 883). If the state were so compelled to take certain actions, Congress would overstep its constitutional bounds. *See New York*, 505 U.S. at 166, 112 S.Ct. 2408. Nonetheless, the *South Dakota* Court concluded that, on the facts of that case, such coercion was not present since the state stood to lose only five percent of its federal highway funding if it failed to enact a minimum drinking age of twenty-one. *See* 483 U.S. at 211–12, 107 S.Ct. 2793. In reaching this conclusion, the Supreme Court declared that the mere effectiveness of a condition in inducing compliance is not evidence of its coerciveness. *See id.* at 211, 107 S.Ct. 2793.

In this case, Congress instituted the *Title IV–D* conditions as a part of its efforts to substantially overhaul federal public assistance programs. It was the Congress' view that fewer federal tax dollars would be needed for such programs if effective mechanisms were in place to better ensure that parents met their legal child-support obligations. The State argues that, in the midst of such efforts, the federal government has improperly coerced it to disrupt its own family court system under the threat of losing federal funding. However, it is undisputed that the State remains, at this time, free to elect the alternative penalty as to either or both the data and disbursement systems. Indeed, the State has already requested, and been approved to accept, the alternative penalty with respect to its disbursement system. (*See* Pls.' Mem. Opp'n Mot. Dismiss Ex. K at 3.) By the State's own admission, this penalty presently amounts to less than one (1) percent of its overall TANF funding, and the loss will increase to a maximum of less

than six (6) percent of the total funding by fiscal year 2004. Similarly, if the State cannot timely create a centralized data system and elects the alternative penalty under § 655(a), it stands to lose only approximately five (5) percent of its overall TANF funding each year that it fails to comply. (*See id.* at 2.) However, these penalties are not cumulative. (*See id.* at 3) Accordingly, even if the State elects to pay the alternative penalties for its inabilities to complete the data and disbursement systems, it faces a maximum loss of less than six (6) percent of its total TANF funds. The *South Dakota* Court found such a proportion of loss to be non-coercive, and this Court is bound to agree. Accordingly, the Court is preliminarily persuaded that the *Title IV–D* conditions are not so overbearing as to create an unconstitutional compulsion.

There looms in the background, however, the possibility that the State might cease to make good faith efforts to complete its systems or refuse to elect the alternative penalty. In such case, it stands to lose the entirety of its federal TANF funding. The Fourth Circuit has suggested, in a plurality opinion, that such a far reaching penalty might be so coercive as to violate the Tenth Amendment. *See Commonwealth of Virginia Dep't of Educ. v. Riley*, 106 F.3d 559 (4th Cir.1997); *see generally College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 697, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) (Breyer, J., dissenting) (discussing Congress' use of sanctions and its spending power in relation to states' sovereign immunity under Eleventh Amendment; "Given the amount of money at stake, it may be harder, not easier for a State to refuse highway funds than to refrain from entering the investment services business."). Hence, the Court will consider the State's request in light of *Riley*. However, at the outset, it is important to note that five judges of the eleven-judge majority in *Riley* specifically declined to concur in the section that con-

tains the Tenth Amendment analysis. An additional two judges dissented from the opinion. Thus, it is unclear what precedential force, if any, that the plurality opinion should have on this particular issue.

In *Riley,* the Secretary of Education had "withheld from [Virginia] 100% of an annual special education grant of $60 million because of [Virginia's] failure to provide private educational services to less than one-tenth of one percent (126) of the 128,000 handicapped students for whom the special education funds were earmarked." *Id.* at 569. According to the record, the loss resulted from the state's decision not to "abandon[ ] one of its most effective tools for maintaining [classroom] order and discipline"—to wit, punishment by suspension. *Id.* (citing *Goss v. Lopez,* 419 U.S. 565, 580, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)). In finding the action to be coercive, the court stated that the Tenth Amendment is emphatically implicated when the federal government "withholds the entirety of a substantial federal grant on the ground that the States refuse to fulfill their federal obligation in some insubstantial respect rather than submit to the policy dictates of Washington in a matter peculiarly within their powers as sovereign states." *Id.* at 570, 95 S.Ct. 729. The State seizes upon this language to argue that the *Title IV–D* conditions are unconstitutional.

However, substantial distinctions separate *Riley* from this case. First, this case does not present the same indicia of an imbalance of power. Part of the evidence of coercion in *Riley* was that the federal government could inflict deeply wounding penalties for a minor, perhaps negligible, infraction by the state. Virginia had arguably fulfilled 99.9% of its legal obligations, but the federal government threatened to rescind 100% of its monies. Such a disproportionate relationship between the parties often, although not always, raises legitimate questions of unconscionability,[18] and the Constitution structurally prohibits such imbalanced federal-state relations. By contrast here, the alleged breach by the State is clearly material and substantial. It is undisputed that the State has failed to come within a fair range of completing its centralized data and disbursement systems. In fact, the State asserts that its current measures are so incomplete that it would require three to five years, (Pls.' Mem. Opp'n Mot. Dismiss Ex. B ¶ 6), and more than $100 million in order to come into compliance. Moreover, Congress has been working with the states for twenty-five years on this issue. Since 1996, it has unambiguously maintained that an essential component of the federal-state relationship, as it pertains to the provision of public assistance, is the creation of an efficient interstate child-support tracking and disbursement system.

Although the Court recognizes that a third party could, arguably, be responsible for the default, this fact is irrelevant as to whether the federal law is coercive as against the states. There is nothing new in holding that a party to a contract is liable for its failure to substantially perform its obligations thereunder even though a subcontractor actually caused the default. The Secretary is not forcing the State to toe an unreasonably strict proverbial line. Rather, she is recognizing the State's non-compliance in a program that bears a clear relationship to the important goal of making sure that needy children and families receive the monies upon which they depend. Because the alleged breach by the State is material and substantial,

---

18. Courts often speak of federal-state relations in contractual terms, *see Butler,* 297 U.S. at 73, 56 S.Ct. 312 ("There is a difference between a statute stating the conditions upon which moneys shall be expended and one effective only upon assumption of a contractual obligation to submit to a regulation which otherwise could not be enforced."); *Virginia Dep't Educ. v. Riley ("Riley I"),* 23 F.3d 80, 87 (1994) ("The result [of the federal-state spending relationship] is akin to a contract between the federal government and each participating state."), and such phrases are illustrative here.

Secretary Shalala's enforcement of the statute does not have the same aura of unconscionability that was arguably present in *Riley*.

Additionally, this case does not tread to the same extent on the State's exclusive policy-making authority. The provisions in *Riley* concerned educational discipline, which has long been recognized as falling within the province of the states. *See* 106 F.3d at 571. By contrast here, the *Title IV–D* conditions pertain to the funding of public assistance and the policing of the interstate travel and commercial activities of delinquent parents. Even though the federal government looks to the states for significant cooperation in these matters, these are domains that are comfortably within the power and expertise of the federal government. Indeed, the fact that the State is not in a superior position to provide effective child-support enforcement mechanisms is evidenced by the class-action lawsuit that is pending against it for its alleged failure to adequately collect support monies that are due. (*See* Defs.' Reply Mot. Dismiss Ex. C.) Based upon these considerations, the Court concludes that this case does not present nearly the degree of pressure that existed in *Riley,* and thus no coercion can be found.

For each of the reasons set forth above, the *Title IV–D* provisions withstand scrutiny and are constitutionally valid under the Spending Clause and the Tenth Amendment. Accordingly, since (1) there is no genuine issue of a material fact in relation to these constitutional questions and (2) the Secretary is legally entitled to the relief that she seeks, the Court will enter a summary judgment as to the State's claims under the Spending Clause and the Tenth Amendment; namely Counts V and VI.

Moreover, although the State alleges that the Secretary has breached her duty of good faith in her performance of some federal-state contract, it is undisputed that no traditional contractual relationship exists between the parties. Rather, since courts use the terminology of contract law to describe Tenth Amendment jurisprudence and federal-state relations, the State has pled a claim in the same vein. Here, the State's breach of contract claim is essentially a Tenth Amendment claim that appears to have been stated in other terms. In analyzing the State's cause as it invokes the Tenth Amendment, the Court has concluded that the federal government has not acted improperly in its bargaining relationship with the State. Hence, the State's breach of contract claim must also fail, and the Court will enter a summary judgment on Count IV as well.

E

The final issue to be resolved in connection with the currently pending motion to dismiss is whether the Department of Health and Human Services has the discretion to amend the penalty structure of *Title IV–D* in order to accommodate a state that, for reasons beyond its control, cannot timely comply with the statute. According to the Secretary's interpretation of the statute, the conditions at issue (to wit, sections 654(16), 654a and 655 of Title 42) do not afford her any discretion to grant the equitable reprieve that the State seeks. In its opposition papers, the State maintains that (1) the Secretary has the inherent authority to exercise her discretion on a case-by-case basis to achieve equitable objectives, (2) the federal mandate has not been violated because it has attempted to satisfy its statutory obligations in good faith, and (3) a wide variety of options are open to the Secretary since Congress has remained silent on this issue.

Before deciding the issue, the Court pauses to note that the State has already elected to incur the alternative penalty for its inability to provide a centralized payment disbursement system. By its own admission, the State has waived any claim to have further administrative review in

connection with its distribution program.[19] Thus, the State's remaining statutory claims relate only to the conditions set forth in 42 U.S.C. §§ 654(16),(24) and 654a (2000), which require each participating state to "have in operation a single state-wide automated data processing and retrieval system" as well as the penalty provisions of § 655. Hence, the Court will consider the Secretary's exercise of discretion as it pertains to these sections.

 Where, as here, a case calls into question the merits of the Department's interpretation of its governing statute, federal courts look to *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), for guidance. There, the Supreme Court set forth a straightforward analysis for such investigations:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.[20] If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based

on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. 2778.

In the present case, the Court concludes that Congress has spoken on the issue. *See Edelman v. Lynchburg College,* 228 F.3d 503, 507–08 (4th Cir.2000) (where the intent of Congress is readily discernible, "we need not proceed further"); *see also Walton v. Hammons,* 192 F.3d 590, 601 (6th Cir.1999) (no further review necessary where "the 'traditional tools of statutory construction' have allowed us to derive a clear meaning to the statute") (citing *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)); *Director, Office of Workers' Comp. Programs, United States Dept. of Labor v. Sun Ship, Inc.,* 150 F.3d 288, 291 (3d Cir.1998) (additional inquiry is warranted "only when the statute does not directly speak to the issue and congressional intent cannot be gleaned from the text of the statute, or its legislative history"); *Wagner Seed Co. v. Bush,* 946 F.2d 918, 920 (D.C.Cir.1991) ("The controlling principle of *Chevron* is that when the statute, viewed in light of its legislative history and the traditional tools of statutory construction, is ambiguous, the administering agency is entitled to make 'a reasonable policy choice.' "). Through 42 U.S.C. § 654(24), Congress mandated that a participating state, such as South Carolina,

> must ... provide that [it] *will have in effect an automated data processing and information retrieval system*—(A) by October 1, 1997, which meets all requirements [that] were enacted on or before October 13, 1988; and (B) by October 1, 2000, which meets all requirements [that were] enacted on or before August 22, 1996 . . . .

---

**19.** The State's acceptance of this penalty did not waive its broader constitutional challenges to the statute. However, the Court reviewed and rejected those arguments in Section IV(D) of this Order.

**20.** (Original footnote 9) (citations omitted). The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, determines that Congress had expressed its intention on a precise question at issue, this declared congressional intention is the law and must be given effect.

(Emphasis added.) This mandate was incident to a lengthy relationship between the federal and state governments on the matters at issue. Indeed, Congress amended the provision as a part of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 so as to grant the states additional time in which to come into compliance with the requirements of *Title IV–D*.[21] Nonetheless, the parties here agree that the State has not yet complied with the statute's conditions.[22]

In such cases, the statute is clear as to the course of action that the Secretary must take. When

> the State has made and is *continuing to make a good faith effort* to so comply [and] the State has submitted to the Secretary a corrective compliance plan that describes how, by when, and at what cost the State will achieve such compliance, which has been approved by the Secretary, ... the Secretary shall not disapprove the State plan ... and *the Secretary shall reduce the amount otherwise payable to the State* [by the designated alternative penalty].

42 U.S.C. § 655(a)(4)(A),(B). Hence, when a state—in the midst of its good faith efforts—fails to submit a compliant plan and to have in effect a statewide data processing system, Congress has decreed that the state's refuge from a total loss of funding lay in its ability to elect the alternative penalty. By the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty.

Here, it appears to be uncontroversial that the State's data system, in its present form, is not sufficiently compliant with *Title IV–D* and thus warrants disapproval unless the alternative penalty is elected. In the meantime, the State seeks a declaration that, regardless of these circumstances, the Secretary can further reduce or waive the alternative penalty since a third-party has caused the default and the State has tried in good faith to comply with the statute. Such a holding would contradict the terms of the statute. A facial reading of *Title IV–D* reveals that Congress intended for good-faith participants to be largely relieved from the financial consequences of their short-comings. However, Congress specified that its participants would not be free from all losses and provided certain penalties to effectuate this intent in light of its other policy judgments.

---

**21.** Prior to the amendments, § 654(24) required the State's plan for compliance to

> provide that if the State, as of October 13, 1988, does not have in effect an automated data processing and information retrieval system meeting all of the requirements of paragraph (16), the State—
> (A) will submit to the Secretary by October 1, 1991, for review and approval by the Secretary within 9 months after submittal an advance automated data processing planning document of the type referred to in such paragraph; and
> (B) *will have in effect by October 1, 1995, an operational automated data processing and information retrieval system,* meeting all the requirements of that paragraph, which has been approved by the Secretary.

42 U.S.C. § 654(24) (1995) (emphasis added).

**22.** Parenthetically, § 654(24) concerns the same "statewide automated data processing and information retrieval system" that is dis-

cussed in § 654(16) and described in detail in § 654a. As part of the Secretary's duties, which are prescribed in § 652, she must disapprove of a state's plan under § 654(16) "unless [s]he finds that such document, when implemented, will generally carry out the objectives of the [processing system] and [the] document" sets forth certain requisite details. 42 U.S.C. § 652(d)(1). Although the Secretary may, in limited circumstances, conditionally approve of a system that substantially complies with all of the statute's requirements, *see* 42 U.S.C. § 652(d)(3), the exception does not ostensibly apply here since the State has admitted that (1) its defaults are substantial and (2) it does not seek conditional approval. During the administrative proceeding, the State declared that it "does not take the position that it is entitled to conditional approval, but only that [the Administration for Children and Families] has the inherent authority to provide for some sanction less than state plan disapproval." (Defs.' Mem. Supp. Mot. Dismiss Ex. I at 2.)

Moreover, even if this Court were uncertain as to whether Congress had left some room for the Department to interpret the relevant portions of sections 652 through 655, such an interpretation would be entitled to deference under the second prong of the *Chevron* analysis. Here, the Department has indicated that it reads its governing statute in the same manner that the Court has set forth above. The Court finds that such a reading is a permissible construction of the statute, and thus it merits deference. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778. Hence, in viewing this case in light of the principles that were set forth in *Chevron*, 467 U.S. 837, 104 S.Ct. 2778, the Court concludes (1) there is no genuine issue of a material fact and (2) the Secretary is entitled to the entry of a summary judgment as a matter of law on this issue.

The State has cited *Alabama Power Co. v. Costle*, 636 F.2d 323, 357 (D.C.Cir.1979), for the proposition that each federal agency has the inherent authority to exempt a particular party from a statutory requirement when equitable considerations are compelling. However, this is an overstatement of the decision by the *Alabama Power* court, which opined that an agency (1) may fill the gaps left within the framework of a statute and (2) can create equitable, case-specific exemptions to the general rules that it makes in the course of its gap-filling activity. In rendering its decision, the Court of Appeals for the District of Columbia Circuit recognized that an agency lacks the authority to take actions that are contrary to the intentions that Congress has expressed in the statute. *See id.* at 357–58 ("Congress may, of course, restrain the agency by mandating standards from which no variance is permitted."); *id.* at 358 ("Courts may not manufacture for an agency a revisory power inconsistent with the clear intent of the relevant statute.") (quoting *Natural Resources Defense Council v. Costle*, 568 F.2d 1369, 1377 (D.C.Cir.1977)). Here, the Court has concluded that the relevant portions of *Title IV–D* reveal the intent of Congress to require the Secretary to enforce the alternative penalty provisions, and the mandatory language of the statute—in light of the policies behind it—precludes the employment of discretion by the Secretary that the State seeks to invoke. As such, the conclusions in *Alabama Power* are of no avail to the State.

Even if the statute does mandate compliance, the State argues that, in light of *Quarles v. St. Clair*, 711 F.2d 691, 709 (5th Cir.1983), a state's good faith efforts to fulfill the conditions of *Title IV–D* render it sufficiently compliant to permit relief from penalization. However, the holding by the *Quarles* court rested upon a matter of statutory construction that does not apply here. In *Quarles*, the parties disputed the import of § 654(7), which required each participating state in the *Title IV–D* program to "provide for entering into cooperative arrangements with appropriate courts and law enforcement officials . . . to assist the agency administering the plan . . . ." 42 U.S.C. § 654(7) (1983). Prior to the commencement of this litigation, Mississippi had not entered into any such arrangements, and the parties argued over whether the state had thereby breached its obligations under the statute. To answer the question, the Court of Appeals for the Fifth Circuit, in looking to the statutory text, concluded that the consummation of an actual agreement was not required. In reaching its decision, the court observed that the words "provide for" do not reveal a legislative intent to require particular results. *Quarles*, 711 F.2d at 710 ("There still remains the issue of whether it must make them. The legislative history of this provision does not show a clear indication of congressional intent."). Indeed, the *Quarles* court noted that Congress could not reasonably mandate such results because "[s]tate courts are independent governmental bodies. They cannot be compelled by the state to enter into cooperative agreements if they decline to do so." *Id.* at 712. As such, the most reasonable construction of the stat-

ute was that states must act in good faith to facilitate the entry of such agreements, but the actual accomplishment of results could not be required.

In this case, it appears that Congress specifically acted to require all of the participating states to achieve certain specified results. In its legislation, Congress expressed a desire that the State, as well as all other participants, must not only "provide for" but also "have in place" a compliant automated data processing system by an identified date. Moreover, there is no impediment to the enforcement of the requirement because the burden of its satisfaction rests solely upon the State. When viewed in this light, a showing of good faith would appear to be irrelevant here since it bears no relationship to the achievement of the results that Congress has mandated. In fact, by specifically attaching a determination of good faith to the alternative penalty provisions in § 655, Congress forestalled the possibility that such a showing might render the State sufficiently compliant with the law as to avoid these penalties. Accordingly, the State's arguments must be rejected, and the Secretary is entitled to the relief that she seeks. A summary judgment shall enter as to Count I. In addition, the parties ostensibly agree that Count II (which is a request by the State for a declaration that an evidentiary hearing should be held on the issue of its good faith) must fail if the Court determines, as it has done here, that the Secretary lacks any discretion under the statute to impose a lesser sanction upon the State than the alternative penalty that Congress has provided. For this reason, the Court shall also enter a summary judgment as to Count II.

## VII

In summary, the Secretary is entitled to the entry of a summary judgment as to all of the claims that have been presented here. The Court lacks jurisdiction to hear the State's contentions with respect to the Due Process Clause of the Fifth Amendment (Count VII) because there is an absence of standing to bring the claim. As to the remaining allegations, the Court is satisfied that there is no genuine issue as to any material fact. The Secretary is entitled to a judgment as a matter of law on the Plaintiffs' counts arising out of the Spending Clause (Count V) and the Tenth Amendment (Count VI), because Congress acted within its constitutional authority. For the same reason, a judgment shall enter against the State's action for breach of contract (Count IV), which is actually a restatement of its cause of action under the Tenth Amendment. As an incident to its decision, the Court has found that the *Title IV–D* conditions are rationally related to Congress' legitimate governmental objectives, and thus Count III ("Declaratory Judgment—Rational Relationship") must be rejected. Moreover, since the Court has concluded that, as a matter of law, the Secretary lacks discretion under *Title IV–D* to afford the state the relief that it seeks, Counts I and II warrant the entry of an adverse summary judgment. Importantly, Count VIII, which is a prayer for injunctive relief, also must be dismissed because each of the State's substantive claims have been adversely adjudicated.

## VIII

As a final matter, the Court acknowledges that the Plaintiffs have filed a motion for the entry of a preliminary injunction, which would temporarily prevent the Secretary from applying the alternative penalty that has been elected in reference to the State's disbursement system. Since this order enters a summary judgment against the Plaintiffs on all claims, the State's motion is denied for reasons of mootness.

## IX

Until a time period of thirty (30) days has elapsed from the date upon which this Order is signed, the conclusions set forth

herein shall not become binding upon the parties.

IT IS SO ORDERED.